**NATIONAL LABOR RELATIONS BOARD**

v.

**TALLADEGA COTTON FACTORY, Inc.**

No. 14829.

United States Court of Appeals, Fifth Circuit.

May 20, 1954.

Rehearing Denied June 10, 1954.

1. Virginia Electric & Power Co. v. N. L. R. B., supra; N. L. R. B. v. McGough Bakeries Corp., 5 Cir., 153 F.2d 420.

210

A. Norman Somers, Asst. Gen. Counsel, N. L. R. B., David P. Findling, Frederick U. Reel, Assoc. Gen. Counsels, George J. Bott, Gen. Counsel, Franklin C. Milliken, N.L.R.B., Washington, D. C., for petitioner.

Frank A. Constangy, Atlanta, Ga., for respondent.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

RIVES, Circuit Judge.

The petition for review presents the novel question of whether the Board may lawfully order reinstatement and back pay to supervisors discharged for failing at their employer's behest to thwart a Union's organizational efforts within a plant,[1] even though supervisors are expressly excluded from the definition of "employee" under the amended Act, because of the claimed restraint and coercive effect resulting from their discharge on the protected non-supervisory employees, in alleged violation of Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1). Incidentally presented are the usual and routine factual issues as to whether the Board's findings of unlawful interrogation and threats against the employees for their union activity, and respondent's discriminatory demo-

1. The Union here involved is Textile Workers Union of America, C.I.O.

tion of one employee and discharge of another for union affiliation, in further violation of Sections 8(a) (1) and (3) of the Act, are supported by substantial evidence on the record considered as a whole. 29 U.S.C.A. § 158(a) (1) and (3). The decision and order of the Board are reported at 106 N.L.R.B. 61.

Respondent, an Alabama corporation, at times here material was engaged in the manufacture and sale of cotton yarn at its Talladega, Alabama plant. When operating at capacity, the plant employed approximately 157 workers, and maintained twisting and spinning departments in three eight hour shifts under the supervision of Marion Shiflett. Another one of respondent's supervisors, Seybourn Pilkington, was responsible for operations in the plant's carting room. Respondent's president, Robert McMillan, and its superintendent, Hunter Murphy, had charge of the overall supervision of manufacturing operations.

In early 1949, as a result of time studies made of the various steps involved in its manufacturing operations, respondent made numerous changes in the working conditions and duties of its employees, imposing upon certain employees increased tasks which they regarded as burdensome. This circumstance, together with lay-offs of both the second and third shifts at respondent's plant and a general wage cut affecting all employees, caused considerable unrest and dissatisfaction among respondent's employees.

Respondent first discovered the union's organizational efforts within its plant when, in early June, 1949, one of its employees, Haywood, reported having observed another employee, Chester Magouyrk, in consultation with a union organizer at Magouyrk's home. Superintendent Murphy, when informed of this fact, immediately held a meeting of certain supervisory and non-supervisory employees of respondent, at which he warned them of the presence of the union representative and directed them to forestall any attempt to organize the employees pending his discussion of the matter with President McMillan. At a subsequent meeting, Superintendent Murphy told the same employees, "to go in the mill and talk to all the help and get them out of the union—that they wasn't going to have no union down at the mill." President McMillan later addressed the same employees in a similar vein, informing a number of them that, as supervisory employees, respondent was relying upon them "to get out there and stop" the union. After interrogating Marion Shiflett as to the number of employees who had already joined the union, McMillan directed the group generally to tell the employees "they would make more money by not joining." According to the credited testimony, McMillan's parting comment upon that occasion was that "there wasn't going to be any union there— that he wouldn't run under a union contract."

The supervisory employees, Shiflett and Pilkington, though personally anxious to remain neutral, nevertheless attempted to comply with McMillan's and Murphy's instructions. On two occasions, acting at the request of Superintendent Murphy, they questioned a number of employees as to their attendance at union meetings and took notes of the information received for respondent's benefit. Shiflett was found to have questioned employees as to their membership in the union, and Pilkington to have asked an employee how he intended to vote in the election and to have warned another employee that some workers would be discharged for their union activities. A number of other supervisory employees of respondent were also found to have engaged in questioning the employees regarding their union activities and as to how they intended to vote.

President McMillan participated personally in the anti-union campaign. He threatened to close the plant if it were unionized, and that house rents in the

"village", respondent's employee housing project, would be raised and the employees' bonus abandoned upon the advent of the union. Though engaging in other specific acts of employee interrogation, McMillan apparently singled out for particular treatment the employee, Chester Magouyrk, of whose leadership in the union's organizational efforts[2] respondent had been fully aware since Haywood's surveillance of Magouyrk in consultation with the union organizer. In July, 1949, McMillan ordered Shiflett to remove Magouyrk from his doffing job, which paid approximately $1.00 per hour, and demote him to the job of roving, which paid only 75¢ per hour, and was the lowest paid job in the mill. Shortly thereafter, McMillan called Magouyrk to his office and accused him of being paid by the union to organize the mill, and asked whether he realized he "had caused women and children to suffer—probably caused somebody to be killed because of the union." A few days later McMillan again called Magouyrk to his office and ordered him, as head of the union, to remove some union leaflets which had been posted on the plant bulletin board. Shortly after this instance, he also forced Magouyrk to pick up and dispose of other union leaflets scattered in the spinning room, telling him, "You are going to cause this mill to shut down."

With reference to the alleged discriminatory discharges of the two supervisors, Shiflett and Pilkington, the credited testimony further reveals that in July, 1949, McMillan told Shiflett that Shiflett's son, Harold, had joined the union, and that "He (McMillan) didn't want him in the union." Superintendent Murphy asked Shiflett to do something about Harold's union membership, and when Shiflett protested there was nothing he could do, Murphy replied, "If he belonged to me I could do something * * * I would run him off from home to get him out of the union."

About a week before the Board conducted election on August 25, 1949, McMillan personally interviewed Shiflett in his office and told him that unless he got the employees out of the union, "He (McMillan) was going to get him another overseer." Murphy also told Shiflett that he would be held accountable for the attitude of respondent's employees and that, if the union won the election, he would be fired. About two days before the union election, McMillan told Shiflett that another one of his sons, Edwin, had been observed keeping company with the union representative and asked Shiflett what he intended to do about it, to which Shiflett replied that his sons were grown men and they could do as they pleased. McMillan then warned that unionization would cause Shiflett to lose his job and his home, and his son Harold to lose both his job and a Studebaker automobile he was then purchasing. Pilkington received much the same treatment during the union's organizational campaign as was accorded Shiflett. He had attended the meetings held by Murphy and McMillan in which the supervisors were warned to "break the union up", had repeatedly questioned the employees as to their union activities at respondent's behest, and had made periodic reports as to the effectiveness of the anti-union campaign to respondent.

Despite the efforts of respondent's supervisory employees, including Shiflett and Pilkington, the union prevailed in the election. Shortly thereafter, respondent carried out its pre-election threat by promptly firing Shiflett, with the observation that he already knew the reason for his discharge. Pilkington was discharged the following morning for the asserted reason, as stated by Murphy, that he "just didn't try hard enough" to keep the union out of the plant. Edwin Shiflett was also discharged on October 4, 1949, ostensibly for tangling yarn on the bobbins, but ac-

2. Chester Magouyrk had obtained signatures of 75 of respondent's employees to applications for union membership, and his home in the "village" had served more or less as a meeting place for union activities.

tually, as the Trial Examiner and Board found, because of his union activities.[3] This employee had joined the union in August, 1949, and thereafter actively participated in the union's organizational campaign. As heretofore noted, Murphy and McMillan had openly evidenced their resentment of his union membership, and had tried unsuccessfully to force him to renounce the union through pressure on his father.

Relying mainly on the above testimony, the Board found that respondent engaged in unlawful interrogation and threats against its employees for their union activity, in violation of Section 8(a)(1) of the Act; that it further violated Section 8(a)(3) and (1) of the Act by discriminatorily demoting Chester Magouyrk and discharging Edwin Shiflett because of their union activities; and, finally, that the discharge of Supervisors Shiflett and Pilkington, because of their failure to wage a sufficiently effective pre-election anti-union campaign, constituted unlawful interference, restraint, and coercion of respondent's non-supervisory employees, in violation of Section 8(a)(1) of the Act. Both the Trial Examiner and the Board rejected respondent's factual contention that Shiflett and Pilkington were discharged for justifiable cause under the Act because of their pro-union activities, and found instead that their discharges actually resulted from their failure to prevent the unionization of respondent's non-supervisory employees. However, though the Trial Examiner and Board were in agreement as to the underlying cause of their discharge, they reached divergent views as to whether, under the circumstances, their discharge was violative of the Act, so as to justify their reinstatement and back pay award.[4]

3. The Trial Examiner further found that Supervisor Shiflett's son, Harold Shiflett, was discriminatorily discharged for union activity, but the Board rejected this inference of respondent's discriminatory motivation as unsupported by the record, and dismissed the charges in this respect. Petitioner does not here seek review of that finding.

4. The Trial Examiner, in recommending that the allegations as to the discriminatory discharges of Supervisors Shiflett and Pilkington be dismissed, concluded in part as follows:

"The undersigned knows of no case in the Board's history that parallels the factual situation found here. Here we have two supervisory employees who carried out the Respondent's instructions to 'keep the boys out of the Union,' and then when they were discharged because they failed to satisfy the Respondent in this regard, a charge is filed in their behalf with the Board on the theory that their discharges interfered with, restrained, and coerced the non-supervisory employees in the exercise of the rights guaranteed them in Section 7 of the Act, 29 U.S.C.A. § 157. Putting it another way it amounts to this; on the one hand their acts of interference, restraint, and coercion are chargeable to the Respondent as violations of Section 8(a) (1), and rightly so, on the other hand their discharge for not working 'hard enough' to satisfy the employer in their efforts to thwart the Union is likewise violative of the same section of the Act. As far as the undersigned has been able to ascertain from Board Decisions and Orders, the Board has consistently refused to go into what 'actual' effect violations of Section 8(a) (1) have on the employees who have been victims of such conduct. For example, the Board 'infers' that interrogation of employees about their union affairs is per se violative of the Act, it does not go into the question as to whether or not it in fact had such an effect. This is as it should be not only for practical purposes, but as an effective way of administering the Act and to promulgate its policies. Who can say how much impact the discharges had on the non-supervisory employees, in the face of 3 months of activity on the part of the same supervisors on behalf of the Respondent in its campaign against the Union? The undersigned cannot answer this question nor will he attempt to do so. Would it not be just as reasonable to infer, upon the facts found herein, that if the two overseers were reinstated that they would be more vigorous in their anti-union activity than they had been before their discharge? Then how could their reinstatement with back pay effectuate the policies of the Act? Suffice it to say however that upon the facts found hereinabove, the undersigned is convinced and he so finds that the Respondent did

Respondent again urges here, as it did before the Trial Examiner and Board, its jurisdictional contention that the allegations concerning the discharges of Shiflett and Pilkington were barred by the limitation provision of Section 10 (b) of the Act, 29 U.S.C.A. § 160(b), which section requires that a charge, in order to support a finding of violation, be filed within six months of the date on which the alleged unfair labor practice was committed. It is argued that the alleged violation with respect to the discharge of these two supervisors was not properly cognizable by the Board in issuing its complaint under the above limitation provision, since this alleged violation was not specifically set forth until the fourth amended charge was filed on September 12, 1950, over a year after the discharges were effected on August 25th and 26th, 1949. The Trial Examiner and the Board, relying upon the broad allegations of violation of Section 8(a)(1) of the Act contained in the original and first amended charges,[5]

not violate Section 8(a) (1) of the Act by discharging Overseers Marion K. Shiflett and Seybourn Pilkington. Consequently he recommends that this allegation in the complaint be dismissed in its entirety."

The Board, however, rejected the Trial Examiner's conclusion in the following language:

"It is clear from the foregoing, as the Trial Examiner found, that the Respondent was motivated in discharging Shiflett and Pilkington by their failure to prevent the Union from becoming the bargaining representative of its employees. Unlike the Trial Examiner, however, we find that these discharges interfered with, restrained, and coerced rank and file employees in the exercise of their self-organizational rights guaranteed in Section 7 of the Act.

"It cannot be seriously argued that the discharges were intended to maintain the Respondent's neutrality. The Respondent's opposition to the Union, which was too well known to the rank and file employees, would belie such an assertion. Indeed, not only did Shiflett and Pilkington, though half-heartedly and under continuous pressure from the Respondent's officials, engage on the Respondent's behalf in conduct prohibited by the Act, but the Respondent's officials themselves and other supervisors also engaged in unfair labor practices. Moreover, the record discloses that non-supervisory employees were aware that Shiflett and Pilkington were acting under instructions from the Respondent to defeat the Union's organizing campaign. Thus, non-supervisory employees were present at meetings when the Respondent directed Shiflett and Pilkington to get the employees out of the Union, when Pilkington protested against Superintendent Murphy's orders to supervisors to 'break the Union up,' and when Murphy instructed Shiflett to secure his sons' withdrawal from the Union.

"In these circumstances, where, as here, the discharges followed immediately on the heels of the Union's victory in the Board-conducted election, the discharges plainly demonstrated to rank and file employees that this action was part of its plan to thwart their self-organizational activities and evidenced a fixed determination not to be frustrated in its efforts by any half-hearted or perfunctory obedience from its supervisors. In our opinion, the net effect of this conduct was to cause non-supervisory employees reasonably to fear that the Respondent would take similar action against them if they continued to support the Union. For this reason, we find that the discharges violated Section 8(a) (1) of the Act."

5. The Trial Examiner held that respondent was placed on notice generally as to all of its Section 8(a) (1) violations by the allegation in the original charge that it "has engaged in and is engaging in unfair labor practices within the meaning of Section 8(a), subsections (1) and (3)" of the Act. The Board noted further language in the original charge stating that "By these acts, and by other acts and conduct, within the past six months, the employer * * * has interfered with, restrained, and coerced its employees in the exercise of their rights as guaranteed in Section 7 of the Act." Further observing that the first amended charge, "Like the original charge, * * * contained a broad allegation of interference with, restraint, and coercion of employees in violation of Section 8 (a) (1)", the Board held that "as the discharge of Shiflett and Pilkington occurred within 6 months of the filing and service of the (first) amended charge, and especially as the allegations of the complaint in question are merely an enlargement of the broad 8(a) (1) allegation of the (first) amended charge, we find that the discharges were properly alleged in the complaint."

both of which were timely filed under Section 10(b), held them sufficient for jurisdictional purposes to embrace and include the additional 8(a)(1) violation as to the two discharged supervisors, as alleged in the Board's complaint.

On this jurisdictional issue, respondent concedes in brief that "the Board may issue a complaint based upon amendments to charges * * * so long as the additional charges * * are similar in nature and origin to the violations alleged in the original charge." See Kansas Mill. Co. v. N. L. R. B., 10 Cir., 185 F.2d 413, 415; N. L. R. B. v. Brown & Root, Inc., 8 Cir., 203 F.2d 139, 146. Indeed, this Court has held that the Board may properly allege in its complaint violations not particularized in the charge, even though the charge antedates the unfair labor practice. See N. L. R. B. v. Westex Boot & Shoe Co., 5 Cir., 190 F.2d 12, 13; Stokely Foods v. N. L. R. B., 5 Cir., 193 F.2d 736, 737–738; N. L. R. B. v. United States Gypsum Co., 5 Cir., 206 F.2d 410, 411–412. However, in the light of the language used in the charges and the theory of violations contained therein, respondent insists that the above rule is not here applicable to sustain the Board's jurisdiction and order in this regard, but urges as here controlling the principle that an amended charge will not be held to relate back to the date of the original charge for jurisdictional purposes where it attempts to set forth a new cause of action. See N. L. R. B. v. I. B. S. Mfg. Co., 5 Cir., 210 F.2d 634, 637; N. L. R. B. v. Vare, 3 Cir., 206 F.2d 543, 546; Joanna Cotton Mills v. N. L. R. B., 4 Cir., 176 F.2d 749, 754. We think that the rule of the I. B. S. Mfg. Co. case, supra, prohibiting an untimely charge from invoking the Board's jurisdiction over "an entirely new and different cause of action", is not applicable or controlling in respondent's favor here,

for it seems to us that the theory of indirect interference and restraint involved in the discharge of the two supervisors, as first set forth in the fourth amended charge, is fairly embraced within the general allegation of direct interference and restraint of the same employees contained in the original and first amended charges. See N. L. R. B. v. Westex Boot & Shoe Co., supra. Unlike the situation presented in the I. B. S. Mfg. Co. case, supra, where an alleged violation of the 8(a) (5) refusal to bargain provision was held to constitute a departure from the timely charged 8(a)(1) and (3) violations, the disputed charges here are based upon the same section of the Act, and were brought in both instances on substantially the same theory and for the same purpose, i. e., to preserve and protect the right of respondent's employees under Section 8(a)(1) to engage in concerted activities, free from respondent's interference and restraint. Under such circumstances, we conclude that the allegations in the complaint with respect to the discharge of the supervisors do not constitute such a departure from the cause of action alleged in the original and first amended charges as would invalidate the Board's jurisdiction and order.

On the merits of this issue, respondent first insists that the substantial and credible record evidence compels a finding that the two supervisors were justifiably discharged for their pro-union activities, rather than for their failure effectively to coerce respondent's employees into renouncing the union. In an attempt to upset this adverse finding of fact by both the Trial Examiner and Board, respondent attacks as inconsistent the Board's findings in the representation proceeding as to the pro-union sympathies of these same two supervisors,[6] with its findings

6. In case No. 10–RC–668 (91 N.L.R.B. 470), involving Board review of the findings of the Regional Director upon informal investigation of respondent's "Objections to the Conduct of the Election",

the Board observed "that Pilkington and Shiflett were sympathetic toward the petitioner (union) and active on its behalf."

in this unfair labor practice proceeding of their anti-union activities at respondent's behest. Respondent ingenuously suggests, both in brief and upon the oral argument, that the Board, though impliedly recognizing in its prior finding respondent's lawful right to discharge these supervisors for their concededly unprotected pro-union activity, has nevertheless unfairly penalized respondent in this proceeding for exercising that right. However, we think that the Trial Examiner and Board properly rejected this alleged inconsistency as unsupported by the record.[7]

▮ Relying mainly upon the decision of the Supreme Court in Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6, respondent next insists that, in ordering reinstatement and back pay in favor of these two supervisors, the Board has unlawfully exceeded its statutory discretion and authority because its order is penal rather than remedial in nature, and for the additional reason that reinstatement of supervisors, as such, is prohibited by express language of the amended act exempting them from the statutory definition of "employee". See 29 U.S.C.A. §§ 152(3), 164(a) and 160(c). The discretionary basis for the Board's order, as set forth in that section of its decision entitled "The Remedy", reads in part as follows:

"We have found that the Respondent discharged Marion K. Shiflett and Seybourn Pilkington and thereby, in violation of Section 8(a)(1) of the Act, interfered with, restrained, and coerced its non-supervisory employees in the exercise of their rights guaranteed under Section 7 of the Act. In order to restore to the non-supervisory employees their full freedom to ex-

ercise these rights and thus to effectuate the policies of the Act, we find it necessary to provide for the reinstatement with back pay of Marion K. Shiflett and Seybourn Pilkington. Accordingly, we shall order the Respondent to offer Marion K. Shiflett and Pilkington full and immediate reinstatement to their former or substantially equivalent positions, without prejudice to their seniority or other rights and privileges, and to make them whole for any loss of pay they may have suffered by reason of their discharge * * *."

Under the facts and circumstances of this case, we construe the Board's order as remedial rather than penal, within the rationale of Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, and Republic Steel Corp. v. N. L. R. B., supra, and as a lawful exercise of the Board's statutory discretion under Section 10(c) to "effectuate the policies" of this Act. See 29 U.S.C.A. § 160(c); Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 543, 63 S.Ct. 1214, 87 L.Ed. 1568; National Licorice Co. v. N. L. R. B., 309 U.S. 350, 365, 60 S.Ct. 569, 84 L.Ed. 799; N. L. R. B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 265, 58 S.Ct. 571, 82 L.Ed. 831.

Prior to enactment of the Taft-Hartley Act in 1947, 29 U.S.C.A. § 141 et seq., the discharge of a supervisory employee for refusing whole-heartedly to engage in unfair labor practices on behalf of an employer was recognized in this Circuit and elsewhere as unlawful interference and restraint of the statutory rights of ordinary employees, as protected under Section 8(1) of the Act. See N. L. R. B. v. Richter's Bakery, 5 Cir., 140 F.2d 870, 871, 872; N. L. R. B.

---

7. The Trial Examiner agreed with the finding of the Regional Director in his report to the effect that the pro-union statements of the two supervisors were "mild in comparison with the systematic interrogation of the employees which they performed at the direction of the employer." The Board further found "that the question of the respondent's motivation in discharging Shiflett and Pilkington was plainly neither litigated nor in issue in the representation case involving objections to the election."

v. Vail Mfg. Co., 7 Cir., 158 F.2d 664, 666–667; Eagle-Picher Mining & Smelting Co. v. N. L. R. B., 8 Cir., 119 F.2d 903, 911, 913. The amended Act made no material change in Section 7 or in Section 8(1) of the old Act, though the statutory definition of "employee" under Section 2(3) was revised to exclude "any individual employed as a supervisor." Under this revised section, supervisors may be discharged for union activities, and employers are under no obligation to bargain collectively with them. However, the amended Act did not diminish the protection previously accorded ordinary employees under Section 8(a)(1),[8] nor do we construe the amendment excluding supervisors from the term "employee" as prohibiting the Board from ordering their reinstatement and back pay under the circumstances of this case.

In the Phelps Dodge case, supra, 313 U.S. at page 191, 61 S.Ct. 845, in considering the proper relation of the Board's remedial powers under Section 10(c) to the old statutory definition of "employee" under Section 2(3), the Supreme Court held that the Board's remedial powers are not expressly limited and restricted under the statutory provision authorizing reinstatement and back pay. 29 U.S.C.A. § 160 (c). Under that decision, it seems to us that the Board still has discretion under the amended Act to dissipate the effects of an unfair labor practice and restore the status quo by directing reinstatement of supervisors and foremen, even though they are not "statutory employees", where it has been found, as here, that their discharge interferes with, restrains and coerces the rights of ordinary employees in violation of Section 8(a)(1) of the Act. See also, Virginia Electric & Power Co. v. N. L. R. B., supra. Though the Board concededly has no authority, statutory or otherwise, to reinstate supervisors as "employees" to redress their private

grievance and penalize respondent, we see no reason why the Board, in the exercise of its statutory discretion, does not have the same remedial power to redress acts of indirect interference and restraint of ordinary employees through discharge of supervisors, as it admittedly has to redress acts of direct interference and restraint with the rights of the same employees to uninhibited self-organization. The contention that the discharge of supervisors for refusal to violate the Act may be effected with impunity because of their supervisory status evinces undue preoccupation with the statutory definition, rather than with the underlying purpose and intent of the Act as a whole. We conclude, therefore, that the discharge of Supervisors Shiflett and Pilkington for their failure to prevent unionization of respondent's plant by means of unfair labor practices at respondent's behest, was violative of Section 8(a)(1) of the Act, and that the Board properly ordered them reinstated with back pay. See Eastern Coal Corp. v. N. L. R. B., 4 Cir., 176 F.2d 131, 136–137; N. L. R. B. v. Universal Camera Corp., 2 Cir., 179 F. 2d 749, 755, reversed on other grounds, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Richter's Bakery, supra; Eagle-Picher Mining & Smelting Co. v. N. L. R. B., supra.

We consider it premature on the basis of the present record to consider the effect of respondent's assertion in brief that the Board's reinstatement and back pay order can have only punitive, rather than remedial effect, because respondent is no longer engaged in business. Neither the Trial Examiner nor the Board have made any finding that respondent has permanently ceased its manufacturing operations, nor does it appear that they have even considered the materiality of any such proof as affecting the proposed remedy. We assume that respondent is not hereby foreclosed from offering further proof be-

8. For the legislative history revealing the purpose of Congress in excluding supervisors from the definition of "employee", see H.Rept. No. 245, 80th Cong., 1st. Session, pp. 13–17; S.Rept. No. 105, 80th Cong., 1st. Session, pp. 3–5.

-fore the Board that its permanent cessation of operation renders the reinstatement provision of the Board's order impossible of compliance. See N. L. R. B. v. Vail Mfg. Co., supra, 158 F.2d at page 667.

Pretermitting further discussion of the purely factual issues involved, we conclude that the findings of both the Trial Examiner and the Board of respondent's unlawful interference and restraint of its employees through interrogation and threats, as well as its discriminatory demotion of Chester Magouyrk and discharge of Edwin Shiflett for union activities, in violation of Section 8(a)(1) and (3) of the Act, are clearly supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456; N. L. R. B. v. Calcasieu Paper Co., 5 Cir., 203 F.2d 12; N. L. R. B. v. Jamestown Sterling Corporation, 2 Cir., 211 F.2d 725; cf. N. L. R. B. v. Southeastern Pipe Line Co., 5 Cir., 210 F.2d 643.

The order of the Board is hereby enforced.

Enforced.