343 F.2d 103
 A. O. SMITH CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, ETC., Respondent.
 No. 13899.
 No. 13958.
 United States Court of Appeals Seventh Circuit.
 March 18, 1965.
 
 COPYRIGHT MATERIAL OMITTED James Poole, Herbert P. Wiedemann, Milwaukee, Wis., for petitioner A. O. Smith Corp.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allen M. Hutter, Atty., N. L. R. B. for N. L. R. B.
 Harold Gruenberg, J. F. Souders, St. Louis, Mo., for International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL-CIO, Local Union No. 575, respondent.
 Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.
 HASTINGS, Chief Judge.
 
 
 1
 These cases are before us on the petition of A. O. Smith Corporation (Company) to review and set aside an order of the National Labor Relations Board issued against Company on July 21, 1961, pursuant to Section 10(f) of the National Labor Relations Act, as amended, 29 U.S. C.A. § 151 et seq., the Board's cross-petition for enforcement of that order and the petition of the Board for enforcement of its order against International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO, Local Union No. 575 (Boilermakers), pursuant to Section 10(e) of the Act.
 
 
 2
 These cases were consolidated for hearing before the trial examiner and for briefing and argument before us.
 
 
 3
 The Board adopted the trial examiner's intermediate report and recommended order. Its decision and order are reported at 132 N.L.R.B. 339 (1961) and its supplemental decision and order are reported at 137 N.L.R.B. 361 (1962).
 
 
 4
 The transcript of testimony in the hearing before the trial examiner exceeds 5600 pages. Because of the voluminous record before us, we shall limit our summary to the relevant parts thereof.
 
 
 5
 Company's Granite City, Illinois plant, which produces automobile frames, is the site of the alleged unfair labor practices. This plant began operation in June, 1954.
 
 
 6
 Several labor organizations conducted organizational campaigns among employees and representation petitions were filed with the Board. The Board entered an order on January 13, 1955 directing that an election be held. The names of five labor organizations appeared on the ballot. On February 14, 1955, Boilermakers was certified by the Board as the exclusive bargaining representative for production and maintenance employees, excluding machine shop employees who were represented by District 9 of the International Association of Machinists, AFL-CIO (Machinists).
 
 
 7
 The organizational campaigns of these five labor organizations apparently divided the employees into factions and caused work stoppages and lack of discipline within the plant prior to certification. After certification these factions continued the struggle for control of Boilermakers.
 
 
 8
 Throughout Company's first two years, it operated in a "background of mutiny." Union officials of Boilermakers, without obtaining permission to leave their work stations, wandered about the plant. There was an average of one work stoppage or wildcat strike every twenty-eight days. During the latter half of this period the collective bargaining contract contained a no-strike clause.
 
 
 9
 In June, 1956, Machinists went on strike and set up a picket line. Boilermakers, whose contract contained a nostrike clause, refused to cross Machinists' picket line and joined Machinists in picketing. This resulted in a shutdown of the plant for one month.
 
 
 10
 In response to an appeal from Company, International Boilermakers placed Local Boilermakers in trusteeship and appointed Fred George as trustee. George ordered Local Boilermakers to return to work. Fifty-nine members, out of more than 1000, obeyed this order by crossing the picket line and returning to work. These members were confined in the plant for nine days by mass picketing.
 
 
 11
 Company obtained a court injunction against mass picketing and acts of violence at the plant gates. The injunction was violated, nineteen persons were held to be in contempt of court and six of these nineteen were given jail sentences. Company discharged these nineteen members. Following negotiations a settlement was reached, a part of which provided that Company would reinstate the discharged members. Plant operations resumed on July 16, 1956.
 
 
 12
 The fifty-nine men who crossed the picket line and entered the plant were designated by the trial examiner as "insiders" and the others were called "outsiders."
 
 
 13
 After Boilermakers returned to work International removed George and appointed William Costello as trustee.
 
 
 14
 Boilermakers officials, at the time the employees returned to work, were insiders. Costello called for an election which resulted in the replacement of these officials by, among others, Willard Herzing, as president and Bill Warfield, as vice-president. Herzing, Warfield and two other newly elected officials were among the nineteen outsiders held in contempt of court for violation of the injunction against mass picketing. They were discharged by Company and later rehired as part of the agreement of Boilermakers to return to work.
 
 
 15
 Subsequent to the election the insiders were harassed. Cherry bombs were exploded behind their work stations, their lockers were set on fire, their tool boxes filled with grease, oil, garbage and other things and their tool handles painted. Company asked Boilermakers officials to cooperate in stopping these incidents and instructed its supervisors to watch for such occurrences.
 
 
 16
 In August, 1956, Costello proposed to Alfred E. Treen, manager of industrial relations at the plant, that Herzing and Warfield be made available full time to help Boilermakers get organized to handle grievances and to prevent work stoppages. Company released both men from their production work for these purposes and agreed to pay them their existing hourly wage for no more than eight hours a day.
 
 
 17
 In June, 1957, while Company and Boilermakers were negotiating wages, labor unrest increased and walk-outs and slowdowns were frequent. Company, in an attempt to maintain discipline, suspended several employees. By June 26, 1957, 300 to 500 employees had been suspended and told to stay out of the plant. Boilermakers officials urged these employees to disregard Company's order and a number of suspended employees forced their way into the plant.
 
 
 18
 As a result, Company shut down the plant and posted notices that the plant would remain closed until "order and reasonable discipline * * * [were] restored." Company announced it was considering closing the plant and moving operations to Milwaukee.
 
 
 19
 An agreement was reached on the conditions which Company would require in order to reopen the plant. This agreement was in writing and included a code of employee behavior called "Points of Good Order." These points were a revision of previous points and included such items as damaging and taking another's property, fighting on premises, refusing to work and damaging company property. Upon ratification of this agreement by the members of Boilermakers the plant was reopened on July 10, 1957.
 
 
 20
 The above events provide some of the background for the following occurrences which constitute the alleged unfair labor practices at issue in this case.
 
 
 21
 Charles W. Harp was sent by Company to the plant in June, 1956 as chief coordinating engineer for the purpose, inter alia, of making a survey and report on how to better the maintenance organization. Among the conclusions in his report were that the maintenance department had too many employees and was oversupervised.
 
 
 22
 In July, 1957, Company implemented Harp's recommendation by shutting down the automatic assembly line. The trial examiner found that Company was originally going to lay off eleven workers, according to seniority, but since Herzing complained that he wanted William Hogan and Elroy Paschedag laid off, (they were purportedly his enemies and higher on the seniority list) Company laid off fifteen workers, including Hogan and Paschedag. The trial examiner stated that these employees were rehired in the production department, except Hogan, Paschedag and Thomas Willmore, and that Herzing persuaded Company not to rehire these employees. As a result of his discharge, Hogan filed a charge against Company with the Board on November 20, 1957. This charge was dismissed by the Regional Director on January 20, 1958 and the dismissal was sustained by the General Counsel on May 14, 1958. These acts, among others set out infra, are relied upon by the trial examiner and Board to support the finding of the trial examiner that Company gave illegal assistance to Boilermakers.
 
 
 23
 In November, 1957, Hogan organized and used his home as headquarters for a group referred to as the dissident Boilermakers. The dissidents were opposed to Herzing and their purpose was to replace him and the other officers of Boilermakers.
 
 
 24
 On December 16, 1957, twenty to twenty-five employees met at Hogan's home. They discussed the discharge of Albert Rowden (related infra) and heard a report from Hogan, who had spoken with Stanley Schuchat, a labor law attorney, concerning how to get rid of Herzing. About December 20, 1957, Hogan and three other dissidents met with Schuchat who suggested a deauthorization election under Section 9(e)(1) of the Act, 29 U.S.C.A. § 159(e)(1).
 
 
 25
 The deauthorization campaign began on January 9, 1958 and continued for about ten days. Deauthorization cards were made available at Hogan's home, a local tavern and a vegetable stand near the plant. Herzing and other Boilermakers officials observed these three sites and learned the identity of employees who visited them. It was estimated that 300 to 800 employees signed deauthorization cards.
 
 
 26
 On January 11, 1958, Herzing began a campaign to have the deauthorization cards revoked by their signers. Herzing, with Treen's permission, posted campaign literature on plant bulletin boards and distributed handbills at the north door of the plant denouncing the deauthorization campaign. Herzing prepared a mimeographed letter which was sent to all employees. He obtained from Treen the names and addresses of the employees on address slips prepared on IBM cards at Company's home office in Milwaukee. Company permitted employees to attend two union meetings during working time, without pay, where the deauthorization movement was discussed. There was testimony and the trial examiner found that some employees who had signed deauthorization cards were threatened by Boilermakers officials with loss of their jobs if they did not sign revocation cards.
 
 
 27
 On December 13, 1957, the financial secretary of Boilermakers, Raymond Ropac and a clerical employee, Delores Lane were in the plant cafeteria collecting and adjusting members' dues. Albert Rowden, a union steward, received a complaint from an employee in his shop that Ropac had demanded dues payments in excess of the amount the employee believed payable. Rowden went to the cafeteria and confronted Ropac with this complaint. Lane and Ropac, in statements recorded and witnessed by personnel supervisor Anthony Trelc, stated that Rowden used profane language in speaking to Ropac, slapped Ropac's hand and stated, "Don't get smart with me or I'll slap you in the puss." Rowden testified at the hearing before the trial examiner that Ropac extended his arm across the table and shook his finger within two or three inches of Rowden's nose. Rowden stated he said, "You get your finger out of my face and stop talking about that or I will slap you in the puss." He denied using profanity or striking Ropac.
 
 
 28
 Herzing informed Treen that Rowden had struck Ropac. Treen directed Trelc to investigate the matter. After investigating, Trelc reported his findings and gave his written reports to Elmer Betz, Rowden's department head. Betz conferred with Rowden's immediate foreman, Mike Zickovich, and after considering the situation for a couple of days they decided to discharge Rowden. The discharge, according to Company, was for using profane and abusive language and threatening an employee in violation of the Points of Good Order.
 
 
 29
 As discussed supra, in July, 1957, the number of employees and supervisors in the maintenance department was reduced. As a result of this reduction, William Randolph, who had been a foreman in the department, was relieved of his supervisory status and put in a position as a production employee on November 4, 1957.
 
 
 30
 On January 16, 1958, Company and Boilermakers signed an agreement which provided that foremen would no longer receive seniority credit for time worked as supervisors. This agreement was made retroactive to February 7, 1957 and reduced Randolph's seniority with the result that he was laid off on January 17, 1958. Randolph testified before the trial examiner that he thought he had been demoted and discharged due to "union pressure." The trial examiner found that Randolph was an enemy of Herzing and was laid off because of Herzing's influence with Company.
 
 
 31
 On January 20, 1958, as a result of his discharge, Randolph, accompanied by Hogan and Thomas Gipson, filed unfair labor practice charges with the Board against Company and Boilermakers.
 
 
 32
 About 10:30 p. m. that night, Randolph and Hogan began picketing the plant. Shortly thereafter, the employees on the third maintenance shift began to arrive. Randolph and Hogan told them they were protesting unfair labor practices of Company and that they were protesting Boilermakers as it was being run by Herzing. The picketing continued until 2:30 p. m. the next day.
 
 
 33
 Approximately ninety-nine employees did not report for work during the picketing. Company discharged twenty-three of these employees. Twenty-one of these persons were discharged for violation of the no-strike clause in the collective bargaining contract.
 
 
 34
 The Board found that these employees were not subject to discharge because the strikers were protesting unfair labor practices of Company.
 
 
 35
 The trial examiner found that Company violated Section 8(a)(2) and (1) of the Act by giving illegal assistance to Boilermakers, Section 8(a) (3) and (1) of the Act by discharging Rowden and twenty-two other employees and Section 8(a) (3), (2) and (1) of the Act by altering the seniority clause in the collective bargaining contract in order to lay off Randolph.
 
 
 36
 The trial examiner found that Boilermakers violated Section 8(b) (2) and (1) (A) of the Act by altering the seniority clause in the collective bargaining contract to lay off Randolph and Section 8(b) (1) (A) by causing Company to demote Randolph from his position as foreman and by threatening employees from January 9, 1958 to January 22, 1958 with physical harm and loss of employment if they refused to revoke authorizations in support of a petition for a deauthorization election.
 
 
 37
 The Board ordered Company to offer Randolph reinstatement as foreman with credit for all seniority to which he was entitled before the January 16, 1958 revision of the labor contract and to offer reinstatement to Rowden and the employees discharged as a result of the January 20, 1958 picketing and make them whole for any loss of earnings resulting from discrimination. The Board ordered Company and Boilermakers to cease and desist from the above unfair labor practices, to make Randolph whole for any loss of earnings resulting from his demotion on November 4, 1957 and to post appropriate notices.
 
 
 38
 The dispositive issues presented are whether the trial examiner was biased against Company and Boilermakers and thus his findings should be set aside and the case remanded for a new hearing and whether the trial examiner's findings of fact are supported by substantial evidence on the record considered as a whole.
 
 I. BIAS
 
 39
 Company in its brief states that a reading of the trial examiner's intermediate report leads inevitably to the conclusion that the trial examiner was so biased that he was incapable of a fair and judicious decision because:
 
 
 40
 "(1) Every Company witness was discredited whenever there was contradicted testimony; moreover, Company witnesses were also discredited when there was no contrary testimony at all;
 
 
 41
 "(2) In numerous critical areas Company evidence was ignored and replaced by the Trial Examiner's own contrary speculations unsupported by any evidence;
 
 
 42
 "(3) Evidence which could not be explained within the thesis of the Trial Examiner was ignored;
 
 
 43
 "(4) Crucial quotations were made out of context;
 
 
 44
 "(5) Intemperate and emotion-charged words and phrases were regularly used by the Trial Examiner to describe both the Company and Boilermakers and their witnesses; and
 
 
 45
 "(6) Uncorroborated evidence was regularly preferred to that which was corroborated, self-serving declarations were used as justification to sweep aside objective evidence and hearsay was preferred to direct testimony."
 
 
 46
 Boilermakers assert substantially the same grounds for finding bias plus the trial examiner's alleged "partisan participation in the hearing as an examiner and cross-examiner of witnesses."
 
 
 47
 We have read the trial examiner's intermediate report and find ourselves in substantial agreement with Company's six contentions quoted above. We do not agree with Boilermakers' assertion that the trial examiner exhibited bias during the hearing which deprived it of a fair and impartial hearing.
 
 
 48
 The fact that a judge or trial examiner may form an unfavorable opinion about a person or group while hearing evidence and as a result use strong language concerning this person or group in his opinion or report is not bias which will vitiate the fairness of the hearing. "This, it may be said, shows that the judge is `hostile,' but even if this be true, the hostility was shaped by the trial, rather than vice versa. Bias or prejudice or hostility becomes a justiciable issue only as it bears on the fairness of the hearing. It cannot be imputed to the fact-trier retroactively, as it were, because his mind has absorbed the impressions left by a full and fair hearing." Gellhorn and Byse, Administrative Law 951 (4th ed. 1960). Accord, Mac Kay v. McAlexander, 9 Cir., 268 F.2d 35, 39 (1959); National Labor Relations Bd. v. Ray Smith Transport Co., 5 Cir., 193 F.2d 142 (1951); National Labor Relations Board v. Air Associates, 2 Cir., 121 F.2d 586 (1941).
 
 
 49
 The cases appear to hold that prejudicial bias by a hearing examiner which results in an unfair hearing requires that the order of the Board based on such unfair hearing be set aside and the case remanded to the Board for a new hearing. E. g., National Labor Relations Board v. Phelps, 5 Cir., 136 F.2d 562 (1943).
 
 
 50
 However, on a careful examination of the record as a whole, we feel compelled to conclude and hold that the bias of the trial examiner in this case, demonstrated only in his intermediate report, is not such as to render the hearing so unfair as to require a remandment for a new hearing. Further, we feel that little good would be accomplished in hearing this protracted matter again.
 
 
 51
 While the hostility of the trial examiner toward Company and Boilermakers, demonstrated in his intermediate report, does not deprive the hearing of fairness and impartiality, this hostility may have affected the trial examiner's objectivity in making his findings of fact and recommended order. "If the fact finder has allegedly credited unsubstantial evidence while disregarding utterly irrefutable evidence, the issue before a reviewing court should not be whether the fact finder was biased, but whether his findings of fact are supported by substantial evidence on the whole record." Gellhorn and Byse, op. cit. supra at 951.
 
 
 52
 "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight," Universal Camera Corp. v. National Labor Relations Bd., 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951), and we are of the conviction the trial examiner's hostility detracts from the weight to be accorded his findings. We thus feel compelled to closely scrutinize the trial examiner's findings.
 
 II. UNFAIR LABOR PRACTICE FINDINGS
 
 53
 The history of this case is dominated by inter and intra-union struggles which caused violence, strikes, picketing and plant shutdowns. The charging parties, most of whom were members of Boilermakers, filed unfair labor practice charges against both Company and Boilermakers.
 
 
 54
 The basic position of the charging parties and the trial examiner's main finding, which is a premise to most of his other findings, is that Company, in an attempt to obtain labor peace, appeased and aided Herzing by discharging employees who opposed and sought to overthrow Herzing (the dissidents in the intra-union struggle) and by giving Herzing and his "henchmen" tacit or explicit approval to interrogate and intimidate employees during company hours and on plant property.
 
 
 55
 Company asserts it was caught in an intra-union struggle, that it attempted to achieve order and discipline but that it did not engage in any illegal activities in pursuing this objective.
 
 
 Albert Rowden's Discharge
 
 
 56
 The facts surrounding this occurrence are hereinabove set out. Company in a separation notice stated that the reason for Rowden's discharge was "Violation of Points of good order, Threatening a fellow employee + use of Profane + abusive language."
 
 
 57
 The trial examiner, in concluding that Company violated Section 8(a) (3) of the Act, found "that the real reason for the disparate treatment accorded Rowden flowed from the Company's animus toward him because of his unwillingness to subordinate his independence of thought and word to the Boilermakers autocracy in the plant, and the Company's acceptance and support of the Boilermakers officials in their ruthless supression of the statutory rights of its employees." The trial examiner found no evidence that Boilermakers caused or attempted to cause Rowden's discharge and recommended the dismissal of this unfair labor practice charge against Boilermakers. After a careful examination of the record as a whole, we conclude there is a gap between the evidence considered by the trial examiner and his above quoted finding, which he bridged by speculation and conjecture.
 
 
 58
 There was no dispute that Rowden's conduct was punishable by dismissal. Under the Points of Good Order, fighting warranted a mandatory discharge while abusive language was subject to a range of discipline from layoff of five days to discharge, at the discretion of Company.
 
 
 59
 Approximately five months prior to Rowden's discharge, Company had agreed to reopen the plant upon the condition that members of Boilermakers ratify an agreement which included the Points of Good Order. Company had been the victim of union struggles which brought plant operations to a standstill and resulted in Company considering moving the plant to a new location. Betz testified he felt Company had been too lax in disciplining employees and that a change in policy would aid in alleviating discipline problems.
 
 
 60
 The trial examiner's recitation of alleged conduct by Herzing and the failure of Company to discipline him is not persuasive. Besides being only circumstantially relevant, it fails to take into account that these alleged acts occurred before the plant shutdown and subsequent ratification by Boilermakers members of the Points of Good Order.
 
 
 61
 In sum, Company's exercise of discretion in deciding to discharge Rowden for violation of the Points of Good Order was not so incredible as to lead to the conclusion that this was not the real reason for the discharge. On the contrary, in view of the history of disruptions in the operation of the plant, Company's agreement to reopen and continue operating the plant if the members of Boilermakers would agree to abide by the Points of Good Order and Company's policy of enforcing these points by more strictly disciplining employees, the decision to discharge Rowden appears reasonable and a proper prerogative of management.
 
 
 62
 In reviewing the record as a whole, we do not find substantial evidence to support the trial examiner's finding, adopted by the Board, that Rowden was discharged for the reason that Company supported Boilermakers and that Rowden displayed an unwillingness to subordinate himself to the views of Boilermakers.
 
 
 William Randolph's Demotion and Layoff
 
 
 63
 As set out above, Randolph was demoted from his position as foreman to rank-and-file employee and was subsequently laid off. The trial examiner found "Randolph was demoted by the Company because it was so willed by Herzing, and hence the Boilermakers," and that Randolph's layoff was "a method [devised by Company and Boilermakers] to get rid of Randolph because of his continued opposition to Herzing and his activities in the movement to unseat Herzing and his clique."
 
 
 64
 Company and Boilermakers contend that the Board has no jurisdiction over supervisors and thus the Board's order of reinstatement to position of foreman and backpay is invalid. We agree with the Board that if Randolph's demotion was an unfair labor practice and if "the employees should regard Randolph's demotion as symbolic of what would happen to them if they, in the exercise of their statutory rights, were to oppose Herzing and his ruling group," the Board has jurisdiction. N. L. R. B. v. Brookside Industries, Inc., 4 Cir., 308 F.2d 224, 228 (1962); National Labor Rel. Bd. v. Talladega Cotton Factory, 5 Cir., 213 F.2d 209, 217, 40 A.L.R.2d 404 (1954).
 
 
 65
 As mentioned previously, in 1956, Harp, chief co-ordinating engineer, was assigned to study the maintenance problem at Granite City. In connection with this study he prepared a written report dated February 3, 1957 which concluded, inter alia, that maintenance had an excess of supervisors. Harp's report indicated an excess of six supervisors and the decision was made initially to eliminate two or three.
 
 
 66
 Harp testified that Randolph was selected as one of the supervisors to be removed because he was one of four or five supervisors considered to have less supervisory ability than the others and because he had seniority which would enable him to continue employment as an hourly employee.
 
 
 67
 It is uncontroverted that the decision to reduce the number of supervisors in the maintenance department was made in the ordinary course of business and was felt to be in the best interests of Company. We feel the evidence supports Company's view that the selection of Randolph, as one of the supervisors to leave the department, was made objectively. We do not find substantial evidence to support the trial examiner's finding that Randolph's demotion was the result of Company yielding to Herzing's wishes.
 
 
 68
 On January 16, 1958, as set out earlier herein, Company and Boilermakers executed an agreement changing the seniority clause in the contract so that foremen would not receive seniority credit in Boilermakers unit for time as foremen. The agreement was made retroactive to February 7, 1957 and resulted in Randolph being laid off.
 
 
 69
 The trial examiner found that "an inherent reason shared by both [Company and Boilermakers for the seniority agreement] was the intention to devise a method to get rid of Randolph because of his continued opposition to Herzing and his activities in the movement to unseat Herzing and his clique, and the retroactivity provision made part of the contract alteration was designed only with Randolph in mind."
 
 
 70
 We are of the opinion, after consideration of the evidence as a whole, that substantial evidence does not support the trial examiner's finding of unfair labor practices by Company and Boilermakers as a result of the seniority agreement.
 
 
 71
 The collective bargaining contract, prior to the new agreement discussed above, provided that, "Employees transferred to other jobs outside the bargaining unit may return to their former jobs without loss of seniority providing their plant service has not been broken." Company and Boilermakers disagreed as to the meaning of this provision and work stoppages occurred when foremen were demoted. Company's interpretation was that demoted supervisors returning to the bargaining unit should return with seniority from the date of original hiring, including credit for the time they were supervisors. Boilermakers took the position that there should be no seniority credit for time in supervision and that employees who were supervisors prior to Boilermakers' election on February 4, 1955 should have no seniority.
 
 
 72
 On about September 21, 1956, five foremen (not including Randolph) were demoted and returned to the bargaining unit. Due to a dispute concerning the seniority of these employees, there were work stoppages and three grievances were filed on February 7, 1957. The grievances were processed through the steps of the grievance procedure and by letter dated February 28, 1957 Boilermakers demanded arbitration.
 
 
 73
 On March 30, 1957, Company and International Brotherhood of Electrical Workers (IBEW) entered into a collective bargaining contract which contained the following seniority provision:
 
 
 74
 "Section 6. If an employee within the bargaining unit is transferred to a position outside the bargaining unit at the Granite City Plant, and is retransferred into the bargaining unit within ninety (90) days he shall be credited with seniority equal to the seniority he had while employed in the bargaining unit plus the time spent outside the bargaining unit. If such employee remains outside the bargaining unit more than ninety (90) days he shall be credited with seniority for time in the bargaining unit only."
 
 
 75
 Due to labor disorder, described supra, the plant closed in June, 1957. In December, 1957, a number of conferences were held on the subject of seniority and Company proposed the above quoted provision contained in the IBEW contract. This proposal was accepted, reduced to writing and dated January 16, 1958. The only change in the above quoted language was the insertion of an effective date of February 7, 1957, the date the original grievances were filed.
 
 
 76
 This agreement caused some ex-foremen to lose seniority. Randolph's seniority reduction required his immediate layoff. Emmet Wassman was demoted from his position as foreman on January 24, 1958. Due to the seniority agreement Wassman would have been subject to layoff if he returned to the bargaining unit. Company gave him the option of taking severance pay and leaving the company. He accepted this option.
 
 
 77
 It is undisputed that interpretation of the seniority agreement was a subject of disagreement which caused work stoppages. This disagreement was a proper subject for bargaining and arbitration between Company and Boilermakers. Company favored giving employees seniority for the entire time they were supervisors. A compromise solution was finally agreed upon which was the same as the agreement reached between Company and IBEW. Randolph had been demoted in November, 1957 and the seniority agreement was made retroactive to the date the grievances were filed, February 7, 1957.
 
 
 78
 The record considered as a whole demonstrates that the compromise solution agreed upon was the result of a genuine dispute resolved by extensive bargaining and that the selection of the effective date of this agreement was reasonable and nonarbitrary. We fail to find substantial evidence to support the trial examiner's finding of unfair labor practices, and so hold.
 
 
 Company Assistance to Boilermakers
 
 
 79
 The trial examiner found that Company violated Section 8(a) (2) and (1) of the Act by giving illegal assistance to Boilermakers as follows: demoting Randolph, discharging Rowden, compensating Herzing and Warfield at their regular rates of pay for time spent in the plant in the conduct of Boilermakers' business other than conferring with Company concerning grievances or contract negotiations, permitting agents of Boilermakers to engage in union activities in the plant during working time to combat the activities of employees in opposition to Boilermakers, permitting Boilermakers to post notices on Company's bulletin board and to distribute literature to employees on company premises in its campaign against employees opposed to it while forbidding employees opposing Boilermakers to engage in such conduct on or within company premises and providing employee addresses to Boilermakers at company expense to be used by Boilermakers to combat the activities of employees in opposition to it.
 
 
 80
 As a sequel to our holdings supra, we hold Company did not give illegal assistance to Boilermakers by demoting Randolph and discharging Rowden.
 
 
 81
 Company, by agreement with Boilermakers, permitted Herzing and Warfield to spend their working time handling union matters and compensated them at their usual rates of pay. The Board, in its brief, does not contend that such agreements are per se unfair labor practices but argues "[a]s it was practiced * * * [this agreement] became a vehicle through which Herzing gained access to the plant at any hour of the day or night and secured control over the Union by threatening employees at their work stations with loss of employment and bodily harm." The trial examiner found Herzing and Warfield were compensated for time spent other than handling grievances or participating in conferences with management.
 
 
 82
 The Board makes the point in its brief that Herzing and Warfield were frequently paid for work in excess of forty hours per week, although the agreement provided they were not to be paid for overtime, and concludes from this fact that Herzing and Warfield were being compensated for improper activities. While the Board is correct as to the number of hours worked by Herzing and Warfield prior to the plant shutdown of June 27, 1957, the record disclosed an abrupt change and apparent new company policy after the plant reopened under the Points of Good Order. Prior to the plant shutdown, from the week ending January 1, 1956 through the week ending June 23, 1957, Herzing worked and was paid forty-seven weeks and Warfield twenty weeks in excess of forty hours. After the plant reopened, from the week ending June 30, 1957 through the week ending September 21, 1958, Herzing worked and was paid one and Warfield three weeks in excess of forty hours.
 
 
 83
 We do not find substantial evidence to support the trial examiner's findings that Herzing and Warfield were compensated for other than time handling grievances or conferences with management.
 
 
 84
 We disagree with the trial examiner's conclusion of unfair labor practice as a result of Company permitting Boilermakers to solicit against the deauthorization campaign on plant property during working hours and, in connection with their campaign against the dissidents, use bulletin boards in the plant and pass out literature on company premises. This practice was consistent with Company policy concerning the dissident group of employees and was not discriminatory. The evidence shows that the dissident group passed out its literature at the main gate to the plant, engaged in solicitation of employees on plant property during working hours and did not ask Company for permission to post notices on plant bulletin boards. It is our view that the Company remained passive and did not lend assistance to either group in connection with the above acts.
 
 
 85
 However, Company was not passive when it gave Boilermakers a set of address cards of all employees who were members of Boilermakers. These cards contained the employees' names and addresses and were prepared by Company with knowledge that they would be used in sending out anti-deauthorization letters. We agree with the trial examiner that this act by Company constituted illegal assistance.
 
 
 Discharge of Twenty-Two Employees
 
 
 86
 The trial examiner found that the employees discharged as a result of the picketing commencing January 20, 1958 were engaged in an unfair labor practice strike and thus were protected against discharge, under the rule announced in Mastro Plastics Corp. v. National Labor Relations Board, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956), even though the collective bargaining contract contained a no-strike clause.
 
 
 87
 We have found but one unfair labor practice by Company, viz., furnishing Boilermakers with the set of cards containing members' names and addresses. The unfair labor practice charge against Company stated, "On or about January 17, 1958, A. O. Smith Corporation * * laid off William T. Randolph * * * because of his activities in behalf of a decertification movement among the members of Local 575 * * *. A. O. Smith Corporation by its officers, agents or representatives has interfered with, assisted and supported said Local 575."
 
 
 88
 The Board, in its brief, while discussing this strike, states that it "concedes that the dissident faction in the Union was primarily concerned with removing Herzing and his cohorts from office because of their continued abuse of their powers."
 
 
 89
 The cause of the picketing and strike was not the furnishing of cards to Boilermakers and thus the discharged employees were not protected under the act as unfair labor practice strikers.
 
 
 90
 We find substantial evidence to support the trial examiner's finding that Boilermakers violated Section 8(b)(1) (A) of the Act by threatening employees if they refused to revoke authorizations given them by Hogan in support of the petition for deauthorization election.
 
 
 91
 In this case Company is caught rather helplessly in the web woven by the threads of internecine warfare waged between Boilermakers and its dissident members. A high cost has been exacted as the fruits of this conflict. Little good has been accomplished thereby and much harm has resulted.
 
 
 92
 We have read this tortious record and reviewed it carefully as a whole. Being mindful of the scope of our review and having considered all issues raised, our decision and holding follows:
 
 
 93
 (1) Enforcement will be granted to the Board's order that Company cease and desist from giving material aid to Boilermakers or any other labor organization;
 
 
 94
 (2) Enforcement will be granted to the Board's order that Boilermakers cease and desist from threatening employees of Company with loss of employment or restraining or coercing them in any other manner in the exercise of their rights under Section 7 of the Act;
 
 
 95
 (3) Enforcement will be denied to all other portions of the Board's order, except as hereinafter next set out; and
 
 
 96
 (4) That Company and Boilermakers shall post notices at designated places relating solely to items (1) and (2) hereinabove set out. The Board shall prepare appropriate notices consistent with this decision.
 
 
 97
 The petition for review is granted and the Board's order will be enforced in part and denied in part agreeable with this decision.
 
 
 98
 Enforcement ordered in part and denied in part.