907 F.2d 400
 134 L.R.R.M. (BNA) 2673, 59 USLW 2065,
116 Lab.Cas. P 10,227
 KENRICH PETROCHEMICALS, INC., Petitioner in No. 89-3392,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
KENRICH PETROCHEMICALS, INC., Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Petitioner in No. 89-3500.
 Nos. 89-3392, 89-3500.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 14, 1989.
Decided Jan. 29, 1990.
Reargued In Banc May 7, 1990.
Opinion July 9, 1990.
 
 Bruce P. McMoran (argued), William A. Behan, John L. Thurman, McMoran & Palmieri, P.C., Lebanon, N.J., for Kenrich Petrochemicals, Inc.
 Jerry M. Hunter, Robert E. Allen, Aileen A. Armstrong, Gen. Counsels, Howard E. Perlstein (argued), Supervisory Atty., David A. Seid, Atty., N.L.R.B., Washington, D.C., for N.L.R.B.
 Argued Dec. 14, 1989.
 Before STAPLETON, GREENBERG, and GARTH, Circuit Judges.
 Reargued May 7, 1990.
 Before SLOVITER, Acting Chief Judge, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, and GARTH, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 Today we address an important issue of federal labor law: whether the National Labor Relations Board (NLRB or Board) may order the reinstatement of a supervisor who was fired in retaliation for her relatives' participation in a union organizational campaign when that campaign succeeded subsequent to the supervisor's discharge. We conclude that the Board's decision to order reinstatement under these circumstances was within the broad discretion afforded it to award such affirmative relief as will effectuate the policies of the National Labor Relations Act (NLRA or Act), 29 U.S.C. Sec. 151 et seq. Therefore, we will enforce the Board's order.
 
 I.
 
 2
 This appeal came before a panel of this court on cross-petitions for review filed by Kenrich Petrochemicals, Inc. (Kenrich) and the Board. In its petition, Kenrich made numerous arguments as to why the NLRB had gone astray in adopting the order of an administrative law judge (ALJ) determining that Kenrich had committed a wide range of unfair labor practices in reaction to efforts to unionize its clerical workers. The Board in turn petitioned for enforcement of its order requiring Kenrich to remedy these unfair labor practices. The panel's thorough opinion addresses all of the issues thus raised. See Kenrich Petrochemicals, Inc. v. NLRB, 893 F.2d 1468 (3d Cir.1990). The members of this court granted rehearing in banc in order to address only one of those issues, namely, whether the Board exceeded its authority by directing the reinstatement of supervisor Helen Chizmar. We have vacated only that part of the panel opinion entitled "Remedy Regarding Helen Chizmar", printed at 893 F.2d at 1480-1482, dealing with this issue.
 
 
 3
 Kenrich manufactures and sells various chemical products. It is a family-owned business that was founded by Eric Spiegelhalder. Spiegelhalder is the father of Kenrich Vice-President Erica Monte, who is married to the company's current President, Salvatore Monte. Several of the Monte's children have been employed by Kenrich at various times.
 
 
 4
 Kenrich is a family business not only in the sense that it is owned by and provides employment for the Spiegelhalders; it was for years also the employer of several members of the Chizmar family. Helen Chizmar was employed by Kenrich for twenty-four years prior to her discharge on May 29, 1987, and for the last ten of those years served as Kenrich's office manager and supervised its clerical staff. Helen Chizmar's father, Frank Sakowski, was the first union shop steward for Kenrich's production workers, who have been represented since the mid-1950's by Local 8-406, Oil, Chemical and Atomic Workers International Union, AFL-CIO. As of May 1987, three other members of Helen Chizmar's family were employed by the company: sister Barbara Knorowski, a sales order clerk who had been with Kenrich since 1962; daughter Karen McPartlan, who had ten years of service with the company and also was a sales order clerk; and daughter-in-law Catherine Chizmar, a secretary who had worked on and off for Kenrich since 1975. Each of these members of the Chizmar family were members of the clerical staff supervised by Helen Chizmar. This situation was apparently not unusual at Kenrich, where, according to Salvatore Monte, many of the rank-and-file production employees are related to supervisors.[1]
 
 
 5
 In May of 1987, Knorowski, Catherine Chizmar, McPartlan, and the other four members of Kenrich's clerical staff, Michelle Bobb, Marge McNally, Judy Kobryn, and Linda Ferrano, signed authorization cards designating Local 8-406 as their bargaining representative. On May 21, 1987, the clerical workers went to Helen Chizmar as a group and told her of their decision to unionize and informed her that the company would receive a letter the next day demanding recognition. Helen Chizmar was, by her account, both shocked and upset at this news. She thought about telling her superiors about the unionization drive that day. However, she was aware that the company would receive the letter the next day in any event, and feared that if she went to her superiors she would be suspected of being involved in the union campaign because of her family members' participation. The next day the company did receive the letter from the union, and Salvatore Monte was greatly displeased by the clerical staff's support for a union.
 
 
 6
 On May 29, 1987, the same day that Kenrich received notice of the petition the union had filed with the NLRB seeking recognition on the basis of the unanimous card count, Monte called Helen Chizmar into his office and discharged her. As Monte fired Chizmar, he explained that: "[we] have to let you go, Helen. We just can't afford you anymore ... we think we can get somebody for $20,000 less and that's what we plan to do." He also told Chizmar that she had done a good job. Monte did not tell Chizmar she was being fired because of the conflict of interest posed by her acting as supervisor of a unionized unit containing members of her family, the rationale advanced by Monte at the administrative hearing.
 
 
 7
 Later that day Monte gave a different reason for Chizmar's firing, telling Kenrich's buyer and admitted agent, Jill Bernicker that "[h]e couldn't keep her for financial reasons and [he] was not going to put up with any union bullshit." App. at 105; 150; 207; 275-76. Despite this reference by Monte to the union, there is no evidence that Chizmar engaged in any pro-union activity or failed to carry out a directive issued by her superiors at Kenrich.
 
 
 8
 At the time of Chizmar's discharge, Monte still hoped to defeat the union and focused his anti-union strategy largely on Helen Chizmar's daughter-in-law, Catherine. Monte believed that Knorowski and McPartlan would be strong union supporters because unionization was in their "family culture," App. at 394, but that Catherine Chizmar was questionable because she had expressed some dissatisfaction with her mother-in-law in the past. Further, Monte had made Linda Ferrano his confidential secretary, thus rendering her ineligible for union member status, and Judy Kobryn was leaving the company. Given these factors, McNally, Bobb, and Catherine Chizmar would be the swing votes in any election, and if any one of them supported the union, the union would win.
 
 
 9
 On June 3, 1987, Salvatore and Erica Monte and Eric Spiegelhalder met with these three workers to attempt to dissuade them from joining the union. Sometime after this meeting, Salvatore Monte spoke with Catherine Chizmar individually after learning she had expressed fears that she would be fired. Monte asked her why she felt that way. She responded that her mother-in-law had been fired after 24 years of service to Kenrich, and that on June 1, 1987, her sister-in-law, McPartlan, and aunt, Knorowski, had each been informed that they would henceforth have to work full-time, despite a long-standing practice whereby they worked part-time or more flexible hours.[2] As she testified: "it seemed like a pattern. It was just going right down the line and I just felt like any day now something would happen to me." App. at 136. Monte reassured Catherine Chizmar about her job security, and said that he fired Helen Chizmar because she could not do the technical end of her job. Monte then began talking about the union, and told her that "[i]f you vote in a union you have to start from scratch. No benefits, no salary, no vacations...." App. at 136-37. He asked Chizmar whether she would like to punch a time clock. The Board found, and Kenrich has not contested, that these statements were unfair labor practices.
 
 
 10
 Later that same day, Monte again approached Catherine Chizmar. He told her he could not fire her because of the Act, and began to give another explanation for her mother-in-law's firing, stating he could not afford Helen Chizmar's salary, and was never able to satisfy her demands. Monte then told Catherine Chizmar that the worst thing that could happen to Kenrich was a union.
 
 
 11
 After these conversations, Monte became convinced that, despite his efforts to convince her to do otherwise, Catherine Chizmar was going to vote for the union. A solid union majority therefore existed. Thus, Monte instructed Kenrich's counsel to inform the union that Kenrich would voluntarily recognize it pending a card count. As is fully described in the panel opinion, shortly thereafter there ensued a serious incident in which Monte, motivated by anti-union animus, knocked Barbara Knorowski against a filing cabinet and proceeded to verbally abuse her and Catherine Chizmar. These acts were among several unfair labor practices directed at members of Helen Chizmar's family by the company in retaliation for their support for the union.
 
 
 12
 The union rejected Kenrich's offer to recognize it on the basis of the card count and insisted on an election. An election was held on July 2, 1987, and the union was victorious. A certificate of representative status was issued by the NLRB on July 10, 1987. Collective bargaining between the union and Kenrich commenced in September of 1987. During the course of these negotiations, Monte told union negotiators that he was going to "get rid of the whole [Chizmar] family." App. at 269.
 
 
 13
 As of today, Helen Chizmar has not been rehired by Kenrich.
 
 II.
 
 14
 While acknowledging that supervisors are not employees cloaked with section 7 rights, see 29 U.S.C. Sec. 152(3) & (11), the ALJ and the Board held that Chizmar's discharge was unlawful under section 8(a)(1) of the Act not because it interfered with Chizmar's rights but because it directly interfered with the section 7 rights of Kenrich's clerical workers, who were clearly protected by the Act.[3] The panel affirmed this determination as in accordance with prior Board decisions finding a violation of section 8(a)(1) where a supervisor who had not engaged in pro-union conduct was discharged in retaliation for the protected concerted activities of her close relatives. Kenrich Petrochemicals, 893 F.2d at 1477 (citing Advertiser's Manufacturing Co., 280 NLRB 1185 (1986), enforced, 823 F.2d 1086 (7th Cir.1987); Consolidated Foods Corp., 165 NLRB 953 (1967); Golub Brothers Concessions, 140 NLRB 120 (1962)).
 
 
 15
 The panel also concluded that the ALJ was justified in finding that "Kenrich failed to prove that Chizmar's anticipated conflict of loyalties in fact contributed to its discharge decision." Id. at 1480. It noted in this regard that this conflict of interest excuse did not emerge until the hearing before the ALJ, and that Monte gave different reasons for the firing to Helen and Catherine Chizmar. The panel also agreed with the ALJ that the timing of Helen Chizmar's firing was very probative, coming at a time when Kenrich believed it could defeat the union and shortly before vigorous attempts to convince its clerical workers, and in particular Catherine Chizmar, to oppose the union. Thus, Monte's contention that he could not keep Chizmar because she could not give Kenrich her undivided loyalty in grievance proceedings or contract negotiations was undermined because Monte hoped at that time to defeat the union and thereby avoid the very need for its supervisors to undertake these responsibilities. The panel concluded that given the lack of substantiation for Kenrich's conflict of interest rationale "the Board and the ALJ were justified in finding that Kenrich's belated explanation for the discharge was pretextual and Kenrich's sole intent was to retaliate against Chizmar's relatives for attempting to unionize." Id. at 1480.
 
 III.
 
 16
 To remedy Helen Chizmar's unlawful firing, the ALJ and the Board ordered that she be reinstated, with an award of back pay, to her position as office manager at Kenrich. Kenrich contends that this remedy is unenforceable as it is inconsistent with the Act's exclusion of supervisors from its protective ambit, and because it serves no proper remedial purpose. The panel agreed with Kenrich that the reinstatement of Helen Chizmar served no remedial purpose and on that ground refused to enforce the Board's order.
 
 
 17
 We review remedial orders of the Board for abuse of discretion. Detroit Edison Co. v. NLRB, 440 U.S. 301, 311 & n. 10, 99 S.Ct. 1123, 1129 & n. 10, 59 L.Ed.2d 333 (1979); NLRB v. Nat'l Car Rental System, Inc., 672 F.2d 1182, 1191 (3d Cir.1982). This scope of review is in keeping with the congressional intent reflected in Sec. 10(c) of the Act, 29 U.S.C. Sec. 160(c),[4] which:
 
 
 18
 charges the Board with the task of devising remedies to effectuate the policies of the Act. The Board's power is a broad discretionary one, subjected to limited judicial review. The relation of remedy to policy is peculiarly a matter for administrative competence. In fashioning remedies to undo the effects of violations of the Act, the Board must draw on enlightenment gained from experience. The Board's order will not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.
 
 
 19
 Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964) (emphasis added; citations and quotations omitted); accord Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 898-99, 104 S.Ct. 2803, 2812-13, 81 L.Ed.2d 732 (1984); NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969); NLRB v. Seven-Up Bottling Co. of Miami, Inc., 344 U.S. 344, 347, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953); Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 539-40, 63 S.Ct. 1214, 1218-19, 87 L.Ed. 1568 (1943); NLRB v. Louton, Inc., 822 F.2d 412, 413 (3d Cir.1987); Leeds & Northrup Co. v. NLRB, 391 F.2d 874, 879-80 (3d Cir.1968).
 
 
 20
 In fashioning a remedy in a particular proceeding, the Board may draw on the knowledge and expertise it has acquired during its continuous engagement in the resolution of labor disputes and need not confine itself to the record of the dispute before it. This freedom has been accorded the Board at least since NLRB v. Seven-Up Bottling Co. of Miami, Inc., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953), when the Supreme Court sustained a formula for calculating back pay with these observations:
 
 
 21
 It is urged ... that no evidence in this record supports this back pay award; that the Board's formula and the reasons it assigned for adopting it do not rest on data which the Board has derived in the course of the proceedings before us. But in devising a remedy the Board is not confined to the record of a particular proceeding. 'Cumulative experience' begets understanding and insight by which judgments not objectively demonstrable are validated or qualified or invalidated. The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process. The relation of remedy to policy is peculiarly a matter for administrative competence ... That competence could not be exercised if in fashioning remedies the administrative agency were restricted to considering only what was before it in a single proceeding.
 
 
 22
 Id. at 348-49, 73 S.Ct. at 289-90 (citations and quotations omitted).
 
 
 23
 Furthermore, in shaping a remedy, the Board is not only concerned with recompensing the injuries suffered by particular protected victims of unfair labor practices, but also with devising the remedy that will best effectuate the public purposes expressed in section 1 of the Act, 29 U.S.C. Sec. 151. These include, inter alia, the encouragement and protection of collective bargaining and the full freedom of association for workers. Id.; Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 193, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941) (The Board "is the agency of Congress for translating into concreteness the purpose of safeguarding and encouraging the rights of self-organization.").
 
 
 24
 Kenrich's first argument is that the Board may not reinstate a supervisor because the Act does not protect a supervisor who engages in union activity. We need not tarry long over this contention. While it is uncontestably true that the Act does not protect a supervisor from being discharged for engaging in concerted activity, this does not deprive the Board of the authority to order the reinstatement of a supervisor whose firing resulted not from her own pro-union conduct, but from the employer's efforts to thwart the exercise of section 7 rights by protected rank-and-file employees. A legion of cases, with which we agree, so hold. See, e.g., Delling v. NLRB, 869 F.2d 1397 (10th Cir.1989); NLRB v. Advertising Mfg., 823 F.2d 1086 (7th Cir.1987); Howard Johnson Co. v. NLRB, 702 F.2d 1 (1st Cir.1983); Belcher Towing Co. v. NLRB, 614 F.2d 88 (5th Cir.1980); Russell Stover Candies, Inc. v. NLRB, 551 F.2d 204 (8th Cir.1977); Pioneer Drilling Co. v. NLRB, 391 F.2d 961 (10th Cir.1968); NLRB v. Electro Motive Mfg. Co., 389 F.2d 61 (4th Cir.1968); Oil City Brass Works v. NLRB, 357 F.2d 466 (5th Cir.1966); NLRB v. Talladega Cotton Factory, 213 F.2d 209 (5th Cir.1954); cf. Local No. 207, Int'l Assoc. of Bridge, Structural & Ornamental Iron Workers Union v. Perko, 373 U.S. 701, 707, 83 S.Ct. 1429, 1432, 10 L.Ed.2d 646 (1963) (Preemption of a state law claim by a discharged supervisor was justified where there was a sufficient probability that the Board could find a violation of the Act and where it "would surely be within the Board's power under Sec. 10(c) to order the union to reimburse the supervisor for lost wages.").[5]
 
 
 25
 Alternatively, Kenrich argues that the case law enforcing Board orders reinstating supervisors does not pertain here because its unlawful motivation for firing Helen Chizmar was related to the union's organizational campaign, and that campaign succeeded despite her discharge. Since the reinstatement order is not necessary to restore the employees' organizational rights, Kenrich contends that it is punitive rather than remedial.[6] We reject this argument because it evinces an unduly cramped view of the section 7 rights belonging to Kenrich's rank-and-file employees and undervalues the coercive effect of Kenrich's wrongful conduct.
 
 
 26
 Under the teaching of Seven-Up Bottling, when an employer fires a supervisor in order to discourage the exercise of section 7 rights by protected employees closely related to the supervisor, the Board, based upon its experience, is entitled to infer in the absence of evidence to the contrary that the intended message was an effective one. Indeed, we do not believe one needs extensive experience with behavior in response to coercive tactics in the workplace to conclude that such a discharge must communicate to rank-and-file employees that the employer is willing to go to any lengths to crush section 7 activity. Moreover in this case, the Board did not need to go beyond the record for evidence of the effect of Kenrich's coercive conduct. The record demonstrates that Helen Chizmar's firing caused Catherine Chizmar to fear for her own job security despite her protected status.
 
 
 27
 As a result, Kenrich can argue only that while its discharge of Helen Chizmar initially may have had a coercive effect in the workplace, the union's success in the election provides adequate assurance that this coercive effect has been fully dissipated and requires no remedial action. But Kenrich's argument ignores the fact that the collective bargaining process is an ongoing one in which employees have repeated opportunities to exercise their section 7 rights; elections are followed by the negotiation of collective bargaining agreements, which in turn are followed by the day-to-day process by which disputes and grievances are resolved in the workplace. Thus, despite the union's success at the ballot box, many opportunities remained for the coercive impact of Helen Chizmar's discharge to take its toll on section 7 rights. Accordingly, the union's election success did not foreclose the possibility that the effects of that discharge would be ongoing.[7]
 
 
 28
 We believe it clear that the task of evaluating the likely rate of dissipation of the coercive impact of Kenrich's conduct, like the task of evaluating its original potency, is one that Congress has entrusted to the Board and its expertise. In making that evaluation in a particular case, the Board may, if it chooses, rely on solely its experience in other like cases.[8] In this case, however, we believe the record reflects specific support for the conclusion that the effects of Kenrich's coercive conduct, if left unremediated, would be felt long after the election. During the September 1987 contract negotiations, the discharge of Helen Chizmar no doubt lent substantial credence to Salvatore Monte's threat to get rid of the whole Chizmar family. If that discharge is left unremedied, the fears engendered by that discharge and Monte's later threats will not be dispelled. Rather, a powerful message will be sent out to the supervisors and employees of Kenrich that the company may, without fear of redress, use family member supervisors as hostages. Kenrich is a family business and Monte testified that many of the company's supervisors have relatives among the rank and file. In the course of deciding whether to take some form of protected action, these employees will realize that if they vigorously exercise their legal rights, their close relatives who are supervisors may be fired with no possibility of recovering their job or lost wages. Conversely, supervisors who have relatives among the rank and file may feel that their job tenure rests on their ability to persuade their relatives to refrain from exercising their section 7 rights in a manner displeasing to Kenrich, knowing that Helen Chizmar lost her job because her relatives supported the union.
 
 
 29
 By reinstating Chizmar and compensating her for lost wages, the Board's order protects the section 7 rights of Kenrich's employees by assuring them that they need not fear that the exercise of their rights will give the company a license to inflict harm on their family. It also protects the employees by reassuring their relatives who are supervisors that they need not feel that their jobs are dependent on their ability to dissuade their family members from engaging in protected activity.[9]
 
 
 30
 In this regard, the present case is essentially identical to the recent case of Advertiser's Mfg. Co., 280 NLRB 1185 (1986). In that case, the Board ordered the reinstatement of a supervisor, Carol Hahn, who was fired to retaliate against her son Ronald, a non-supervisory employee, for his pro-union activities. The discharge occurred shortly after the union had won an election and was but one of a myriad of unfair labor practices committed by the company. The Board adopted the ALJ's finding of a violation and his recommendation that Hahn be reinstated with back pay:
 
 
 31
 In Consolidated Foods Corp., 165 NLRB 953 (1967) ... and in Golub Bros. Concessions, Y140 NLRB 120 (1962), the Board found that employers had violated Section 8(a)(1) by discharging supervisors because of the union activities of employees who were members of the discriminatees' families. The supervisors themselves had not engaged in any union activity....
 
 
 32
 The discharges of Carol Hahn and the supervisors in Consolidated Foods and Golub Bros. were not the result of any participation in union or concerted activities. On the contrary, the supervisory discharges resulted solely from the independent exercise of section 7 rights by employee relatives. Furthermore, the direct, severe, and unmistakable thrust of the act of the discharge was to interfere with those employee relatives in the exercise of their rights. The Board does not lack the power to protect those employees. Here, for instance, the impact of Carol Hahn's discharge on her employee son's union activities, magnified by other unlawful acts directed by the [Company] against Ronald Hahn, compels that he be protected by finding a violation and by ordering reinstatement and back pay for his mother.
 
 
 33
 280 NLRB at 1185-86 (emphasis added); see also International Union of Operating Engineers, Local 400, 265 NLRB 1316 (1982) (the coercive effect of a discharge of a family member, in this case from a janitorial services contract, upon employees cannot be fully eliminated without an award of full compensatory relief).
 
 
 34
 On petition for review to the Seventh Circuit, the company urged that firing a supervisor for her relatives' union activities cannot violate the Act, and that even if it may, a supervisor so discharged may not be reinstated. See NLRB v. Advertisers Mfg. Co., 823 F.2d 1086 (7th Cir.1987). The court rejected both arguments. As to the first, the court stated:
 
 
 35
 To retaliate against a man by hurting a member of his family is an ancient method of revenge, and is not unknown in the field of labor relations. If the company had fired Ronald Hahn in retaliation for his election as chief shop steward, there would be no question that it had violated the Act. Instead, it fired his mother. If he loves his mother, this had to hurt him as well as her. An effective method of getting at him, a protected worker, it is barred by the statute.
 
 
 36
 Id. at 1088-89.
 
 
 37
 The court then addressed the question of the propriety of Carol Hahn's reinstatement in terms that are particularly apt to Helen Chizmar's discharge:
 
 
 38
 The Board's remedy may seem problematic: forcing the company to reinstate a supervisor. The supervisors are supposed to be on the company's side in labor disputes. It ... would be anomalous to force the company to reinstate a supervisor who was on the union's side. But as a matter of fact, Carol Hahn was, so far as appears, on the company's side. She did not assist in her son's union activities. The company is not being asked to grasp a viper to its bosom.... Carol Hahn is not being reinstated so that she can help the union but so that Ronald Hahn and other protected employees will not be deterred from exercising their rights under section 7 by fear that if they do the company will try to get back at them in any way it can, including by firing their relatives. Of course, the company's action in firing Carol Hahn may have created bitterness and undermined her loyalty, but if so the company has only itself to blame.
 
 
 39
 Id. at 1089 (citations omitted).
 
 
 40
 The rationale of Advertisers Mfg. Co. applies with full force here. Helen Chizmar did not in any way aid the union's cause, and her reinstatement was not ordered to protect her right to participate in union activities. Rather, her reinstatement was ordered to demonstrate to the employees and supervisors at Kenrich that our labor laws do not permit employers to intimidate protected employees by using family member supervisors as hostages. If the Board were only permitted to remedy a relative's unlawful firing by posting a notice, there would be scant protection for employees seeking to freely exercise their rights.
 
 
 41
 Moreover, we believe, as did the Board in Advertiser's Mfg., 280 NLRB at 1185, that the rationale for ordering make-whole relief is as strong in circumstances where a supervisor is discharged because of the protected activity of a family member as when a supervisor is discharged for failing to commit an unfair labor practice or for testifying before the Board. In situations where a supervisor has been discharged for failing to commit an unfair labor practice, reinstatement has been justified on the ground that it "dissipate[s] the effects of an unfair labor practice and restore[s] the status quo." Talladega Cotton Factory, 213 F.2d at 217; see also Delling, 869 F.2d 1397; Howard Johnson, 702 F.2d 1; Belcher Towing Co., 614 F.2d 88; Russell Stover Candies, Inc., 551 F.2d 204. By its very nature, a supervisor's refusal to commit an unfair labor practice cannot adversely affect the rights of the rank-and-file employees under her control, and reinstatement of the supervisor is not necessary to remedy an unfair labor practice that did not occur. Yet, the Board has thought it necessary to reinstate a supervisor fired for this reason in order to ensure that the firing will not intimidate the employees' future exercise of section 7 rights. For example, the Board, as quoted in Talladega Cotton Factory, 213 F.2d at 214 n. 4, said this in ordering the reinstatement of supervisors discharged for failing to commit unfair labor practices:
 
 
 42
 the discharges plainly demonstrated that the [Company's] action was part of its plan to thwart [the employee's] self-organizational activities and evidenced a fixed determination not to be frustrated by any half-hearted or perfunctory obedience from its supervisors. In our opinion, the net effect of this conduct was to cause non-supervisory employees reasonably to fear that the [Company] would take similar action against them if they continued to support the union.
 
 
 43
 Similarly, where a company fires an employee's close relative to punish the employee, that employee is likely to reasonably believe that the employer will go to any lengths to get rid of the union and that the next step in that scheme may be her own discharge. Reinstatement in this situation, as in cases where supervisors are dismissed for failing to commit unfair labor practices, serves to dispel employees' fears and concomitant reluctance to fully exercise their rights, by demonstrating that the law sets boundaries on employers' ability to engage in this sort of conduct with impunity.[10] Virginia Elec. & Power Co., 319 U.S. at 541, 63 S.Ct. at 1219.
 
 IV.
 
 44
 In conclusion, the Board did not abuse its broad discretion to devise a remedy for Helen Chizmar's discharge that would effectuate a policy of the Act. The reinstatement and back pay order issued is reasonably calculated to dispel the intimidation caused by her firing. The Board's order will be enforced.
 
 
 45
 GREENBERG, Circuit Judge, dissenting.
 
 
 46
 I am unable to join in the majority's opinion because, in my view, the National Labor Relations Board has failed to produce substantial evidence to support its determination that Helen Chizmar's reinstatement with backpay would serve a legitimate remedial purpose under the National Labor Relations Act. In all cases, remedies calling for the reinstatement of supervisors should give us pause, as they compel the employer to revive an employment relationship which, under the Taft-Hartley amendments, 29 U.S.C. Sec. 152(3) & (11), it has unfettered discretion to discontinue. Yet the majority holds that the Board may impose such remedies based solely on its expert judgment that the remedy will prove a benefit to the employees' protected concerted activity. In the alternative, it asserts that there is substantial evidence supporting the remedy in this case. I cannot agree with either of these contentions. As I feel strongly that the majority's extreme deference to the Board's broad remedial authority has caused it to approve a remedy which will do nothing more than recompense a supervisor for Kenrich's unlawful conduct, I respectfully dissent.
 
 
 47
 In approving the Board's determination that Helen Chizmar's discharge violated section 8(a)(1) of the Act, 29 U.S.C. Sec. 158(a)(1), the panel recognized that supervisor discharge cases are analytically difficult because they implicate two distinct policies of the NLRA:
 
 
 48
 The issues, as framed by Kenrich, bring into sharp relief a difficult and recurring problem in the federal labor law, namely the extent to which the Board, in seeking to vindicate the statutory rights of rank and file employees, may limit an employer's otherwise unfettered right to discharge a supervisor. On the one hand, the [Taft-Hartley Amendments] excluded supervisors from the statutory definition of protected employees in order to preserve the employer's right to the undivided loyalties of its supervisory personnel.... On the other hand, the Board has long recognized, with court approval, that the Taft-Hartley amendments do not license an employer, on pain of discharge to compel a supervisor to serve as a conduit for unfair labor practices or take other action which 'directly interferes' with employees' statutory rights.
 
 
 49
 893 F.2d at 1477 (citations omitted). In this case, the Board's liability determination was consistent with the Taft-Hartley amendments, as Kenrich failed to prove that it discharged Chizmar because of the conflict of loyalties she would experience if her relatives succeeded in unionizing. To the contrary, the record amply supported the administrative law judge's factual finding that Kenrich's "sole intent was to retaliate against Chizmar's relatives for attempting to unionize." 893 F.2d at 1480.
 
 
 50
 But Kenrich, in committing an unfair labor practice, did not forever forfeit its right under the Taft-Hartley amendments to demand the undivided loyalty of its supervisory personnel. In reviewing the Board's liability determination, we considered Kenrich's claim of a conflict of loyalties to be "highly suspect" because the discharge occurred before the union was in place. Id. at 1480. However, as the union prevailed in the election notwithstanding Kenrich's unlawful conduct, the Board's reinstatement order will restore Chizmar to a position where she inevitably will experience an actual conflict between her loyalties to Kenrich and to her relatives, so long as they are employed by Kenrich. Accordingly, the remedy phase of this case implicates the policies embodied in the Taft-Hartley amendments in a very real sense.
 
 
 51
 Thus, the situation here is distinguishable from that in NLRB v. Advertiser's Mfg. Co., 280 NLRB 1185, enforced, 823 F.2d 1086 (7th Cir.1987), because there, the discharged supervisor did not directly supervise her immediate relatives. 280 NLRB at 1198, 1202. The arguments advanced by Kenrich were unavailable to the employer in Advertiser's Mfg. Co., which was confined to arguing that it discharged the supervisor because of her incompetence. Id. at 1202. If in Advertiser's Mfg. Co., the employer had substantiated its claim, no reasonable argument could be made that the discharge had anything to do with the employees' union activities. But here, in defending itself against the section 8(a)(1) charge, Kenrich specifically relied on the employees' union activities as the "but for" cause of Chizmar's discharge, as it asserted that the conflict of loyalties which necessitated Chizmar's discharge originated when her relatives supported the union campaign. Brief at 30-31. As the panel's decision indicates, Advertiser's Mfg. Co. provides substantial guidance as to the Board's analytical approach to the question of employer liability in supervisor discharge cases. 893 F.2d at 1477-78. However, the majority's reliance on Advertiser's Mfg. Co. is misplaced because the differences between the two cases are extremely significant insofar as the remedies are concerned.
 
 
 52
 According to the majority, Chizmar's reinstatement will serve a remedial purpose because it will
 
 
 53
 assur[e] [Kenrich's employees] that they need not fear that the exercise of their [section 7] rights will give the company license to inflict harm on their family. It also protects the employees by reassuring their relatives who are supervisors that they need not feel that their jobs are dependent on their ability to dissuade their family members from engaging in protected activity.
 
 
 54
 At 409.
 
 
 55
 Assuming as true the majority's premise that the remedy is capable of producing these salutary effects on the work place, I cannot accept its implicit assumption that Kenrich's unlawful conduct was the source of the conditions which the Board seeks to rectify.
 
 
 56
 What the majority fails to appreciate is that the advent of unionization in Kenrich's clerical staff in fact gave rise to a serious conflict of loyalties which would have justified Kenrich in discharging Chizmar in the absence of its violation of section 8(a)(1). The status quo ante which the Board seeks to restore includes the circumstance that the organizational activities of Kenrich's clerical staff placed Chizmar in the untenable position of supervising a small bargaining unit composed largely of her close relatives. It was Kenrich's unlawful intent which transformed its otherwise lawful discharge into an unfair labor practice.[1] If at the time of the discharge, Kenrich's sole intent had been to free itself of a conflict-ridden supervisor, there would be no 8(a)(1) violation. Yet if Kenrich had discharged Chizmar for lawful reasons, the employees could not help but realize that their exercise of their section 7 rights cost Chizmar her job. Chizmar herself understood that her relatives' organizational activities might jeopardize her job and, had Kenrich resolved to discharge her only if the union prevailed in the election, might very well have attempted to dissuade them from pursuing the union. App. at 221-22, 235-37.
 
 
 57
 It might be argued that in reconstructing the status quo which would have existed but for the unfair labor practice, we must presume that, at the time of the organizational campaign, Kenrich did not view the conflict as sufficiently serious to discharge Chizmar, as it did not prove that the conflict influenced its discharge decision. But even accepting this premise, we cannot speculate that upon Chizmar's reinstatement, Kenrich voluntarily will tolerate a conflict of loyalties which, if anything, has become more acute during her absence.[2] In Advertiser's Mfg. Co., the reinstatement order could restore a status quo ante whereby the supervisor's job security would be unaffected by her relatives' union activities. But here, even if Kenrich's conduct is irreproachable in the future, it is left with two choices, neither of which is free from difficulties under the Act. Either Kenrich's experience in this proceeding will inhibit it from exercising its rights under the Taft-Hartley amendments, or it will discharge Chizmar soon after her reinstatement, in which case the adverse impact on her relatives will be no less than it is now. The Taft-Hartley problem posed by Chizmar's conflict of loyalties is inescapable, as Chizmar hardly can dissolve the family relationships which gave rise to it. On this record, I cannot fathom how the policies underlying the Act will be served by restoring Chizmar to her position.[3]
 
 
 58
 It is no answer to say that the remedy need not meet the demands of a particular case. However that, in essence, is what the majority has said. As I understand it, the majority holds that, absent evidence to the contrary, the Board could infer from its past experience in cases of retaliatory discharges that Chizmar's reinstatement is the most effective means of ensuring that the employees will not be intimidated in future exercises of their section 7 rights and therefore, the remedy was within the Board's broad remedial authority. At 409 In other words, the majority maintains that the Board may apply generic remedies for particular types of unfair labor practices unless the party opposed to imposition of the remedy proves that the case warrants a different remedial approach.
 
 
 59
 I cannot subscribe to this conception of the Board's remedial authority. While the Board has wide discretion in fashioning remedies for unfair labor practices, it still must produce substantial evidence supporting its application of the remedy in a particular case. To be sure, NLRB v. Seven-Up Bottling Co. of Miami, Inc., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953), upon which the majority relies, could be interpreted to mean that in all cases, the Board is free to rely solely on its expertise when selecting remedies for unfair labor practices. However, we have not construed Seven-Up Bottling Co. so broadly and, in any event, I do not think that the Supreme Court meant to relieve the Board of its burden of proving the propriety of unconventional remedies which frustrate clear statutory objectives.
 
 
 60
 In Seven-Up Bottling Co., an employer objected to the Board's application of a formula for calculating a backpay award to seasonal employees on the ground the formula did not account for seasonal variations in the employees' income. The Court accepted the Board's explanation that application of the backpay formula was reasonable because the formula reflected its past experience that alternative means of calculating backpay induced employees to waive their rights to reinstatement. Id. at 347-48, 73 S.Ct. at 289-90. As the case concerned the unlawful discharges of employees, the fact that the employees had sustained compensable injuries because of the employer's unfair labor practices was never in dispute. The reinstatement and backpay orders, in themselves, were neither novel, unconventional, or untraditional and obviously rested within the competence of the Board, even though particular evidence as to the amount of backpay due was lacking.[4] In my view, Seven-Up Bottling Co. stands for the unremarkable proposition that the Board need not reaffirm the validity of its conventional remedies every time it applies them.
 
 
 61
 By its own terms, Seven-Up Bottling Co. does not require a court to defer to the Board's judgment when a reasonable argument can be made that the remedy is "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). In Seven-Up Bottling Co., 344 U.S. at 348, 73 S.Ct. at 290, the Court expressly stated that it did not intend to cast doubt on Republic Steel Corp. v. NLRB, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940), which held that the Board's authority under section 10(c) is limited to remedial as opposed to punitive measures.[5] The Court's reference to Republic Steel Corp. would be meaningless if Seven-Up Bottling Co. was intended to circumscribe judicial review of the Board's remedies to the extent which the majority believes it did, as Republic Steel Corp. clearly calls upon the courts of appeals to ensure that the Board does not exceed the limits of its remedial authority.
 
 
 62
 In cases since Seven-Up Bottling Co., the Supreme Court has indicated that reviewing courts must test the Board's remedies to ensure that they have an adequate factual foundation and serve legitimate remedial purposes. Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 900, 104 S.Ct. 2803, 2813, 81 L.Ed.2d 732 (1984) ("[I]t remains a cardinal, albeit frequently unarticulated assumption, that a backpay remedy must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practice") (emphasis in original); Beth Israel Hosp. v. NLRB, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473-74, 57 L.Ed.2d 370 (1978) (the Board's remedial orders are reviewable "for consistency with the Act, and for rationality, ... [and] if supported by substantial evidence on the record as a whole must be enforced").
 
 
 63
 Sure-Tan is especially informative, as it rejected as speculative an unconventional remedy designed to afford unlawfully discharged employees some measure of relief in face of unique factual circumstances which made it highly improbable that the employees would receive any compensation through the conventional remedies of reinstatement and backpay.[6] Sure-Tan suggests that the Board must adduce specific evidence supporting its imposition of remedies which are not expressly authorized by the statute. Here, the Board's remedy not only is unconventional but it thrusts upon Kenrich an employment relationship with a supervisor which the Taft-Hartley amendments say it may discontinue. Given the Supreme Court's insistence in Sure-Tan on specific evidentiary support for a remedy directly affecting statutory employees, I cannot read Seven-Up Bottling Co. as a blanket license for the Board to order the reinstatement of unlawfully discharged supervisors in the absence of evidence clearly demonstrating the need for this extraordinary remedy.
 
 
 64
 Moreover, the majority's shifting of the burden to the employer to produce evidence disproving the propriety of a remedy, which has been selected solely on the basis of the Board's expert judgment, is inconsistent with express provisions of the Administrative Procedure Act, 5 U.S.C. Sec. 556(d), and the Labor Management Relations Act, 29 U.S.C. Sec. 160(e), which clearly require the Board's findings to be supported by "substantial evidence." Furthermore, the majority unwittingly has cast a shadow on a legion of our cases which have examined whether the Board has met its burden of proof regarding its remedial orders. Systems Management, Inc. v. NLRB, 901 F.2d 297, 308 (3d Cir.1990); NLRB v. Louton, Inc., 822 F.2d 412, 414 (3d Cir.1987); United Oil Mfg. Co. v. NLRB, 672 F.2d 1208, 1211-12 (3d Cir.), cert. denied, 459 U.S. 1036, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982); NLRB v. Permanent Label Corp., 657 F.2d 512, 521 (3d Cir.1981), cert. denied, 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982); NLRB v. K & K Gourmet Meats, Inc., 640 F.2d 460, 469-70 (3d Cir.1981); Frito-Lay v. NLRB, 585 F.2d 62, 68 (3d Cir.1978). See also Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). I need not belabor the point that the Board's opinion that a particular remedial order will effectuate the purposes of the Act is no substitute for substantial evidence.
 
 
 65
 The majority, however, does not rest on its holding that the Board's expertise, without more, is sufficient to sustain its remedial order. In the alternative, the majority insists that Helen Chizmar's reinstatement with backpay is appropriate because the record "reflects specific support," at 408, for an inference that Chizmar's discharge had a coercive effect on protected employees which extended well beyond the organizational campaign which Kenrich unlawfully sought to thwart. Accordingly, the majority rejects Kenrich's argument that the remedy must be tested in the context of an organizational campaign but instead, asserts that the remedy will ensure the employees' ability to engage in the full panoply of section 7 rights without fear of retaliation.[7]
 
 
 66
 Insofar as the Board seeks enforcement of its cease and desist order prohibiting Kenrich from attempting retaliatory discharges of other relative-supervisors, I agree with the majority. NLRB v. Raytheon Co., 398 U.S. 25, 28, 90 S.Ct. 1547, 1549, 26 L.Ed.2d 21 (1970), held that a union's certification does not moot a proceeding to enforce a cease and desist order based on an employer's illegal preelection conduct. The Court reasoned that an employer's cessation of the specific illegal conduct which has given rise to the Board's liability finding does not provide adequate assurance that it will not resume such conduct in future elections. Id. But in Raytheon, the Court quite clearly was concerned with the Board's ability to remedy the particular type of unfair labor practice which gave rise to the statutory violation. Raytheon does not authorize judicial enforcement of remedies for preelection misconduct based on the Board's vague assertions that they will safeguard the employees' rights in later phases of the collective bargaining process. In other words, the Board cannot cite its need to deter a section 8(a)(5) violation as its rationale for a remedy involving a preelection violation of section 8(a)(1). The remedy must be specifically tailored to effectuate the specific statutory policy frustrated by the employer's unfair labor practice.[8]
 
 
 67
 As the remedy must, in some way, preserve the employees' election rights, I attach no significance to Monte's comment during negotiation of the collective bargaining agreement that he intended to get rid of the whole Chizmar family. The comment arguably would support a finding that Kenrich engaged in bad faith bargaining in violation of section 8(a)(5).[9] But Kenrich was not charged with bad faith bargaining and in any event, the comment has no bearing whatsoever on the coercive effect of Kenrich's conduct on the election process. The only other evidence cited by the majority is Catherine Chizmar's testimony that during the union campaign, Helen Chizmar's discharge caused her to fear that she might be fired if she supported the union. But Catherine Chizmar's fear of retaliation was not so overwhelming as to prevent her from openly supporting the union.
 
 
 68
 Instead, the record unequivocally demonstrates that Helen Chizmar's reinstatement with backpay could not serve any legitimate remedial purpose. Chizmar was terminated on May 29, 1987, and, on June 16, Kenrich offered to recognize the bargaining unit. After the employees rejected that offer, an election was held on July 2 in which the union prevailed. Following the union's certification on August 11, Kenrich and the union began negotiating a collective bargaining agreement. The majority's holding that it is necessary to reinstate Helen Chizmar to correct the effects of the unfair labor practice defies common sense. Her reinstatement will be meaningless in that respect but will frustrate the policy of the Act with respect to supervisory employees.[10]
 
 
 69
 The majority concedes that the Board's remedial orders are reviewable for an abuse of discretion. I would hold that there has been a per se abuse of discretion by the Board where, as here, the record utterly contradicts the Board's assumptions about the need for a remedy which obviously will undermine a clear statutory objective. The reinstatement with backpay of a supervisory employee never should be regarded as a routine remedial practice. In this case, the Board's chosen remedy confers benefits flowing exclusively to a supervisor and as such, exceeds its remedial powers. See Hi-Craft Clothing v. NLRB, 660 F.2d 910, 918 (3d Cir.1981) ("When only the supervisor's interests are at stake, ... the intent of the Taft-Hartley Amendments is to deny jurisdiction to the Board."). While I appreciate the narrow scope of our review of the Board's remedial orders, Louton, 822 F.2d at 414, the majority's deference to the Board does not justify its abdication of judicial responsibility in this case. In these circumstances, I am constrained to dissent.
 
 
 70
 Circuit Judges HUTCHINSON and GARTH join in this dissent.
 
 
 
 [1]
 For example, supervisor Thomas Washington's son Thomas Washington, Jr. is a union member and production employee, under his father's supervision
 
 
 [2]
 The Board determined that the elimination of part-time employment among the clerical staff violated sections 8(a)(1) and 8(a)(3) of the Act. Kenrich did not seek review of this finding
 
 
 [3]
 Section 8(a)(1) of the Act, 29 U.S.C. Sec. 158(a)(1), makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the Act]". Section 7 of the Act, 29 U.S.C. Sec. 157, provides in pertinent part:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....
 
 
 [4]
 This provision gives the Board authority to "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of the [Act]." 29 U.S.C. Sec. 160(c)
 
 
 [5]
 To the extent it can be argued that this question is ambiguously addressed by the statute, we believe the Board's long-standing interpretation of the Act as giving it the power to reinstate supervisors fired in violation of section 8(a)(1) is reasonable, and therefore owed deference. NLRB v. United Food & Commercial Wkrs., Local 23, 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987)
 
 
 [6]
 Kenrich did not dispute the propriety of the ALJ's recommendation that Helen Chizmar be reinstated before the Board; it limited itself to arguing that her dismissal did not violate section 8(a)(1) of the Act. Nor did Kenrich raise an objection to the Board's reinstatement remedy in its initial briefs to this court, again limiting itself to arguing that the Board's finding of a violation was erroneous. Only when asked by this Court to address the question of whether Helen Chizmar's reinstatement was consistent with the statutory exclusion of supervisors from the Act's protection did Kenrich argue that the remedy selected by the Board was inappropriate
 Though the Board has not objected that Kenrich has waived its argument by failing to raise it at the administrative level, see 29 U.S.C. Sec. 160(e), we nonetheless must tread lightly lest we fault the Board and the ALJ for failing to address contentions that Kenrich simply did not make. Given the failure of Kenrich to argue to the Board that the reinstatement of Helen Chizmar could not be justified under the reasoning of prior Board precedent finding that reinstatement was an appropriate remedy for the unlawful discharge of a supervisor, we will not remand because the Board and the ALJ failed to explain why this case did not constitute an exception to its precedent indicating that reinstatement of an unlawfully discharged supervisor generally effectuates the policies of the Act.
 
 
 [7]
 We reject the dissent's assertion that the Board's remedy of a section 8(a)(1) violation occurring in the course of an election campaign may not be sustained on the basis that it eliminates the effects of that violation on the exercise of employees' section 7 rights after a union victory. By its own terms, section 8(a)(1) makes it an unfair labor practice for an employer to restrain or coerce employees in the exercise of their section 7 rights. 29 U.S.C. Sec. 158(a)(1). These rights include, inter alia, "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. Sec. 157. It surely effectuates the Act to ensure that employees who have survived the rigors of an organizational campaign tainted by unfair labor practices and have voted in a union are not hindered in their ability to capitalize on this victory because of the lingering in terrorem effects of unlawful employer conduct during the election campaign. After all, section 7 does not just guarantee employees the right to vote for a union, it guarantees them the right to bargain collectively through that union
 The dissent's reliance upon NLRB v. Raytheon Co., 398 U.S. 25, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970), as supportive of its contrary position is flawed by its failure to point out that, in that case, the certified election that occurred after the issuance of the Board cease and desist order resulted in a majority vote against the union. Id. at 26, 90 S.Ct. at 1548. The Court held that the certification of this election did not moot the issuance of a cease and desist order because there was no showing by the employer that the unfair labor practices found by the Board would not recur and the "Act is not designed merely to protect a particular election or organizational campaign." Id. at 27, 90 S.Ct. at 1549. Thus, the employees were entitled to have an enforceable order prohibiting recurrence of the employer's unlawful conduct in subsequent elections. Id. at 27-28, 90 S.Ct. at 1548-49. Given the failure of the union to prevail in the election, there was no occasion for the Court to focus on the effect the preelection conduct might have had on the union's ability to effectively represent the employees.
 
 
 [8]
 We, of course, acknowledge, as the dissent stresses, that Board dispositions of unfair labor practice charges, like other administrative adjudications, must be supported by substantial evidence. In most cases, the evidence of what transpired, if sufficient to support the finding of an unfair labor practice, will suffice to support the Board's decision respecting an appropriate remedy. Having determined the nature and extent of the violation, the Board is entitled to use its experience to predict the continuing effects of that violation and to decide what remedy will best ameliorate those effects. NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969); see also American Broadcasting Cos. v. Writers Guild, 437 U.S. 411, 432, 98 S.Ct. 2423, 2435, 57 L.Ed.2d 313 (1978) (the inquiry whether conduct would have a certain effect in the workplace "is ... necessarily a matter of probabilities, and its resolution depends much on what experience would suggest are the justifiable inferences from the known facts ... [t]his seems to us to be peculiarly the kind of determination that Congress has assigned to the Board"); Republic Aviation Corp. v. NLRB, 324 U.S. 793, 799-800, 65 S.Ct. 982, 986-87, 89 L.Ed. 1372 (1945). This is essentially what happened in this case, where the Board applied its practice of reinstating unlawfully discharged supervisors to dissipate the serious coercive effects it believes such discharges have on the section 7 rights of affected employees
 "This is not to say that the Board may apply a remedy it has worked out on the basis of its experience, without regard to circumstances which may make its application oppressive and therefore not calculated to effectuate a policy of the Act." Seven-Up Bottling Co., 344 U.S. at 349, 73 S.Ct. at 290. In a case where the employer has introduced evidence showing that its case is materially different from those upon which the Board's experience is based, we must of course measure the reasonableness of the Board's decision against the record of the specific case we are reviewing. However, in doing so, we must give deference to the Board's expertise and enforce its order remedying that violation of the Act unless "it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co., 319 U.S. 533, 540, 63 S.Ct. 1214, 1218 (emphasis added).
 Nor does the principle that the Board, in deciding upon a remedy, may apply its experience to the facts evidencing the violation mean that there are no remedy issues with respect to which record evidence beyond that supporting liability is necessary. The character of the issue determines whether additional evidence is required. Where the issue involves predicting the effects on the workplace of a particular unfair labor practice or a particular proposed remedy, reliance on Board experience will normally suffice. Obviously, the Board's experience in prior cases will not suffice if the issue is whether a certain employee was disabled during the period for which she claimed back pay. See, e.g., NLRB v. Louton, Inc., 822 F.2d 412, 413-14 (3d Cir.1987). Similarly, where, as in the "Gissel order" cases relied upon by the dissent, the law imposes a threshold level of egregiousness that an employer's conduct must achieve before a particular remedy may be used, there must be substantial evidence that the employer's conduct exceeded the threshold. See, e.g., NLRB v. Permanent Label Corp., 657 F.2d 512, 521 (3d Cir.1981) (in banc), cert. denied, 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982); NLRB v. K & K Gourmet Meats, Inc., 640 F.2d 460, 469-70 (3d Cir.1981); Frito-Lay v. NLRB, 585 F.2d 62, 68 (3d Cir.1978). Unlike the dissent, we conclude that the remedy issues contested before us are of such a kind that the Board could resolve them by applying its experience to the facts supporting liability.
 
 
 [9]
 The analysis and conclusion of the dissent are dependent on its assertion that Kenrich is "clearly entitled to discharge Chizmar because of the conflict which arose as a result of her relatives' union activities." At 413 n. 1. Because the Board found as a matter of fact that Kenrich was not motivated by fears of a conflict of interest, it did not have occasion to consider the substantial question of whether the Act is violated when an employer who has tolerated a supervisor's family-related conflict of interest for a lengthy period of time decides that he will no longer tolerate that conflict because the supervisor's relatives have now unionized
 The Board is the body Congress primarily entrusted to strike the balance between provisions of the Act, NLRB v. Local 103, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978), and its decision in Parker-Robb Chevrolet, Inc., 262 NLRB 402 (1982), indicates that it is not insensitive to the force of the Taft-Hartley amendments. While the dissent embraces an expansive view of the Taft-Hartley amendments' scope, the degree to which the Taft-Hartley amendments limit the Board's ability to proscribe and remedy supervisor-directed conduct that impinges on employees' section 7 rights is a matter of considerable difficulty and is not clearly answered by the Act. See, e.g., Comment, Union Busters and Front-Line Supervisors: Restricting and Regulating the Use of Supervisory Employees During Union Representation Election Campaigns, 135 U.Pa.L.Rev. 453, 473 (1987) (arguing that the legislative history to Taft-Hartley indicates that Congress' primary purpose was to prohibit supervisor unions, and that the supervisory loyalty doctrine extends to only those situations where supervisors act in a pro-union manner). If Kenrich discharges Chizmar upon her reinstatement and an unfair labor practice proceeding is commenced, the balance the Board strikes in that proceeding between Kenrich's right to loyalty from its supervisors and its employees' section 7 rights will be entitled to appropriate deference by this court.
 In such a proceeding, the Board will be able to consider whether a subsequent discharge is truly attributable to Kenrich's belief that Chizmar cannot effectively perform her responsibilities or whether the discharge is merely a remnant of hostility Kenrich feels towards its clerical workers because of their support for the union. Such a proceeding would undoubtedly entail an inquiry into the effect of unionization on Chizmar's responsibilities, and into Kenrich's apparent willingness to tolerate the conflict of interest Chizmar had when it came to enforcing Kenrich's work rules and in providing Kenrich with input about the appropriate pay for the clerical workers in a non-unionized workplace. Before unionization, for example, Chizmar presumably desired to see her family members avoid discipline and earn higher pay.
 With respect to this case, we merely affirm the Board's determination that the reinstatement of Chizmar effectuates the policies of the Act. The fact that Kenrich may thereafter dismiss her for reasons that are lawful does not differentiate this from numerous other cases in which reinstatment has been ordered following a discharge for an impermissible reason.
 
 
 [10]
 In addition, unless supervisors who refrain from engaging in unlawful conduct are assured that their refusal will not irreparably harm them, there would exist a strong incentive for them to acquiesce in their employers' request to commit unfair labor practices to the detriment of employees' section 7 rights. When a supervisor is fired to retaliate for her relatives' protected conduct, and when that firing does not serve its immediate purpose--such as defeating a union's organizational campaign--reinstatement also redresses the incentive structure created by the unlawful conduct by assuring supervisors that they need not convince their relatives to refrain from protected activity in order to avoid discharge
 
 
 [1]
 The panel had to make some very fine distinctions to resolve the liability question in this case. Kenrich clearly was entitled to discharge Chizmar because of the conflict which arose as a result of her relatives' union activities. 893 F.2d at 1480. It committed an unfair labor practice solely because its subjective intent when discharging her was to discourage her relatives from supporting the union. Id
 
 
 [2]
 Kenrich's tolerance for supervisor Thomas Washington's working relationship with his son does not necessarily indicate that it will be indifferent to Helen Chizmar's conflict of loyalties upon her reinstatement. Kenrich reasonably might distinguish between the degree of intimacy it will tolerate between supervisors and employees in its production plant and in its management offices, where supervisors might have greater accessibility to confidential information concerning Kenrich's position on union matters. Furthermore, the inferences we may draw from the Washingtons' situation are limited because there was a "level of supervision" between Washington and his son. App. at 493
 
 
 [3]
 I recognize that the Board has been entrusted with the task of "giv[ing] coordinated effect to the policies of the Act." NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 348, 73 S.Ct. 287, 289-90, 97 L.Ed. 377 (1953). However, I do not view this as a case which requires us to defer to the Board's expert judgment in harmonizing inconsistent labor policies. Without a doubt, if Kenrich, after reinstating Chizmar, decides that it cannot retain her as a supervisor because of her conflict of loyalties, the Board cannot prevent it from discharging her without running afoul of the Taft-Hartley amendments. But if a lawful discharge of Chizmar dampens her relatives' enthusiasm for the union, Kenrich cannot be held responsible. Absent proof of antiunion animus, the fact that an employer's activities may have the effect of discouraging union activity does not indicate that the employees' rights have been violated. Thus, Chizmar's reinstatement will not confer any lasting benefits on the employees but will severely limit Kenrich's rights under the Taft-Hartley amendments
 
 
 [4]
 In cases of employee discharges, the statute expressly authorizes the Board to order their reinstatement with back pay. A supervisor's reinstatement with backpay, if permissible, lies within the nebulous terrain of other "affirmative action" the Board may take, in addition to issuing a cease and desist order, to "effectuate the policies" of the Act. 29 U.S.C. Sec. 160(c)
 
 
 [5]
 Republic Steel Corp. is particularly instructive here, as it rejected the idea that a remedy which, at best, has the effect of deterring future unfair labor practices is permissible under the Act. The Court stated:
 We do not think that Congress intended to vest in the Board a virtually unlimited discretion to devise punitive measures, and thus to prescribe any penalties or fines which the Board may think would effectuate the policies of the Act. We have said that 'this Authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board may be of the opinion that the policies of the Act might be effectuated by such an order.' We have said that the power to command affirmative action is remedial, not punitive.... We adhere to that construction.
 In that view, it is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end.
 311 U.S. at 11-12, 61 S.Ct. at 79 (citations omitted).
 Insofar as the majority's holding rests on its assumption that the Board's remedy will deter Kenrich from attempting future retaliatory discharges of relative-supervisors, it is inconsistent with Republic Steel Corp. Republic Steel Corp. does not bar the Board from considering the deterrent effect of a remedy along with other factors relevant to the specific remedial task it faces. However, with the exception of cease and desist orders, which are expressly authorized by 29 U.S.C. Sec. 160(c), the Board under Republic Steel may not rely on a remedy's deterrent value as its sole reason for applying the remedy in a particular case.
 
 
 [6]
 In Sure-Tan, the Court upheld the Board's decision, affirmed by the Court of Appeals for the Seventh Circuit, that an employer had violated sections 8(a)(1) and (3) of the Act, 29 U.S.C. Secs. 158(a)(1) and (3), by reporting undocumented alien employees to the Immigration and Naturalization Service (INS) in retaliation for their participation in a successful union campaign. 467 U.S. at 894-97, 104 S.Ct. at 2810-11. By the time the complaint was issued, the employees were no longer present in the United States, as they had accepted the INS's grant of voluntary departure as a substitute for deportation. Id. at 887, 104 S.Ct. at 2806. As a remedy, the Board ordered that the employees be offered reinstatement with backpay but left until subsequent compliance proceedings the question of whether the backpay should be tolled for any periods in which the employees were unavailable for work due to their absence from the United States. Id. at 889, 104 S.Ct. at 2807. The Court of Appeals modified the order to provide that reinstatement offers were to be conditioned on the employees' lawful presence within the United States. Id. In addition, the court decided that the employees should be deemed unavailable for work "during any period in which they were not legally entitled to be present and employed in the United States." Id. at 890, 104 S.Ct. at 2807-08. Recognizing that its modifications would effectively deprive the employees of any remedy under the Act, the court suggested that the Board award a minimum of six months backpay to compensate the employees for the losses of their jobs. Id. at 890, 104 S.Ct. at 2808. The Board accepted the court's suggestion when it modified its order upon remand
 The Supreme Court agreed with the Court of Appeals that any reinstatement offers had to be conditioned upon lawful presence within the United States, but reversed insofar as the orders provided for minimum backpay awards, in part, on the ground that the Board lacked the authority to impose the awards "in the total absence of record evidence as to the circumstances of the individual employees." Id. at 901, 104 S.Ct. at 2813. In doing so, the Court made clear that a backpay award must reflect the "actual, compensable injuries suffered by the discharged employees." Id. Although the Court conceded the "probable unavailability" of any effective remedies for the unfair labor practices, it observed that "[a]ny perceived deficiencies in the NLRA's remedial arsenal can only be addressed by congressional action." Id. at 904, 104 S.Ct. at 2815.
 
 
 [7]
 In examining these contentions, I set aside my reservations about Chizmar's job security in the absence of the unfair labor practice. See supra, at 404-05
 
 
 [8]
 This is not to say that a cease and desist order is the only type of remedy the Board may order in the case of a preelection violation. Quite clearly, if employees have been discharged in retaliation for their support of the union, the statute authorizes their reinstatement with backpay regardless of whether the union has succeeded in the election. In cases where the violation does undermine the union's support, the Board may order a new election or issue a bargaining order. NLRB v. Gissel Packing Co., 395 U.S. 575, 612-15, 89 S.Ct. 1918, 1939-40, 23 L.Ed.2d 547 (1969). But if the union succeeds and no employees have been discharged, a cease and desist order may be the only remedy the Board legitimately can impose
 
 
 [9]
 The comment was made during negotiation of the plant workers' collective bargaining agreement and was the sole reference to the clerical workers. App. at 313-14
 
 
 [10]
 I add that the majority does not even touch on how a backpay award to Helen Chizmar will benefit the employees except perhaps, in its generalized statements that the employees' rights cannot be effectively vindicated unless Chizmar is made whole. In the case of protected employees, backpay routinely is awarded to compensate them for actual economic losses they have sustained as a result of their unlawful discharges. Sure-Tan, 467 U.S. at 900, 104 S.Ct. at 2813. Here, there is not a shred of evidence that any of Chizmar's family members shared in her salary so that her loss of income caused any economic hardship to them. Of course, the Board does not assert that the remedy is needed to compensate the employees for any economic injury but alleges only that it will relieve the employees of the lingering coercive effect of Kenrich's unfair labor practice. I have doubts that backpay to Chizmar is a legitimate means of achieving this goal